City of Chicago, a Municipal Corporation, Petitioner-Appellee, v. George F. Harding Collection, Defendant-Appellant.

### Gen. No. 50,042.

First District, Fourth Division.

August 4, 1965.

Supplemental opinion May 6, 1966.

Mayer, Friedlich, Spiess, Tierney, Brown & Platt, of Chicago (Sherwood K. Platt, George W. Hamman, and David S. K. Platt, of counsel), for appellant.

Raymond F. Simon, Corporation Counsel, and Thomas A. Foran, Special Assistant Corporation Counsel, of Chicago (Thomas A. Foran and Thomas T. Burke, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

Defendant appeals from a judgment entered on a jury verdict for $140,000 as compensation to defendant for property taken by the City through condemnation for conservation purposes as part of the Hyde Park-Kenwood Renewal Project. The property which

is the subject of these proceedings is located at 4853 South Lake Park Avenue, Chicago, and consists of land having a frontage of approximately 160 feet, improved with four buildings known collectively as the George F. Harding Museum. The premises had housed numerous exhibits of paintings, ship models, musical instruments and many other kinds of art objects, particularly a noted collection of medieval armor.

We are aware of no decided case concerning condemnation of a building used for museum purposes. Because of the extraordinary character of the premises it was determined by the trial court that the usual measure of compensation—fair market value—would be applied only to the land, and that the improvements would be considered as "special use" buildings [1] compensable on the basis of replacement or reproduction value less depreciation. Both parties concede the appropriateness of these ground rules, and no point has been raised concerning them on this appeal. United States v. Two Acres of Land, 144 F2d 207, 209 (7th Cir 1944); In re Simmons, 127 NYS 940, 941. As the trial developed, the record relates primarily to replacement rather than reproduction value.

One contention which has been presented as a ground for reversal relegates to the background all other points raised. It involves the application of simple arithmetic to the pertinent provision of the Illinois Bill of Rights and, in our opinion, disposes of

---

[1] Not to be confused with "special purpose" buildings. The latter are designed for a particular or special use, whereas "special use" buildings are not so designed originally, but at the time in question are being put to a "special use." In the instant case, two of the four structures had been originally designed for museum purposes, but were not properly so designed, according to plaintiff. All four buildings were treated by the trial court, without objection by either party, as falling in the "special use" category.

the appeal without need for consideration of other arguments.

██ ██ Article II, § 13 of the Illinois Constitution states: "Private property shall not be taken or damaged for public use without just compensation." It has been repeatedly held that this provision is "self-executing," which is to say that it is not susceptible of impairment by the act of any branch of government, nor is any legislation required for its enforcement. People ex rel. Markgraff v. Rosenfield, 383 Ill 468, 50 NE2d 479; Cohen v. City of Chicago, 377 Ill 221, 36 NE2d 220; People ex rel. Alexander v. City of Mt. Vernon, 404 Ill 58, 88 NE2d 45.

██ It is also well settled that the owner of property taken for public use is entitled to that amount of compensation which will put him in as good financial condition as he was when the condemnation petition was filed. County Board of School Trustees v. Elliott, 14 Ill2d 440, 152 NE2d 873. And nothing short of an award of this character will conform to the constitutional requirement. Illinois Cities Water Co. v. City of Mt. Vernon, 11 Ill2d 547, 144 NE2d 729.

██ ██ These are broad-gauge principles, and, while of course they are binding upon the courts, they should also be understood as requiring strict adherence by a condemnor in the presentation of its case. In fact, this type of case is not the ordinary adversary proceeding in that the condemning authority has the burden of proving the defendant's "just compensation." The County of Cook v. Holland, 3 Ill2d 36, 40, 119 NE2d 760; Department of Public Works & Bldgs. v. Bloomer, 28 Ill2d 267, 270, 191 NE2d 245; Department of Public Works & Bldgs. v. Bohne, 415 Ill 253, 262, 113 NE2d 319. While it is likely, of course, that there will be differences of opinion as to value among the various witnesses, the condemnor's burden must be construed to require, as a minimum, that there

be competent evidence of value as to all the property to be taken. As stated in IPI (committee comments on Section 300.30), "The true burden is one of introducing evidence and the decision on whether it has been met is for the court, not the jury."

■ ■ The City's case, as presented by five witnesses, was made on the perfectly acceptable theory of replacement cost less depreciation. But the City's witnesses testified consistently about a "replacement" building [2] which would be substantially smaller in square footage and with less than half the cubic footage of the present buildings. To ignore the essential elements of floor space and ceiling height in the "replacement" of a museum building is to ignore also the constitution's command for just compensation.

Edward Olson, a witness for the defendant, testified to having made a computation of the size of the present buildings. He said that they contain 27,444 square feet and 465,546 cubic feet. Harry Schlaes, for the City, testified that the buildings total 26,700 square feet "in round figures." William Epstein, also for the City, testified to a figure of 26,811 square feet.[2a] The City's witnesses did not testify to the cubic footage of the building complex; two stating expressly that they did not know and did not consider the cubic footage of the Harding buildings, and the others taking the same position by inference.

The witnesses called by the City were a construction engineer, an architect, a photographer, and two real estate broker-appraisers. The photographer, who submitted pictures of the Art Institute, did not testi-

---

[2] The dispute here is not over the value of the land but only that of the buildings.

[2a] The City's brief contains the statement: "It was established beyond a doubt that the total square footage was between 26,700 and 27,500 square feet."

fy as to the size of a "replacement" building, but all the other witnesses uniformly talked about a building of approximately 20,000 square feet. The architect submitted preliminary drawings of such a building made in cooperation with the engineer, and these exhibits were admitted into evidence. With minor variations it may be said that all the City's "replacement" evidence related to a building such as the one represented in the architect's drawings. As shown by these drawings, it would have a total square footage of approximately 18,850, including walls, stairways, etc., and a 4,000 square foot basement area. Reduced to interior plane space (by excluding only the walls) the building's area for all floors would be about 18,000 square feet. The cubic footage on the same basis would be about 230,000 as compared to 465,546 in the present buildings. Thus the square and cubic measurements of the building proposed by the City would have to be increased approximately 50% and 100%, respectively, to equal the dimensions of the buildings being "replaced." The critical importance of the size of such a building is, of course, due to the fact that the City's witnesses used it as the basis for their opinions concerning construction costs with the expectation that these, in turn, would affect defendant's ultimate compensation.

The only justification suggested by the City for basing its case on such a disproportionately small "replacement" building is found in the testimony of its four witnesses to the effect that only 20,000 square feet of the present buildings were being used for exhibition purposes. Codd (an architect) said: "I arrived at 20,000 square feet for the replacement building by the area needed to equal the exhibited space of the Harding Museum." Schlaes (a real estate appraiser) simply stated: "I would replace the structures with a two-story building with about 20,000

square feet. . . . It (a replacement building of 20,000 square feet) is not equal in total area to the present buildings because there are portions of the existing buildings that are not being used as a museum." Kuehl (an engineer) testified: "I estimated the cost of the replacement of the whole structure. . . . We can construct a building of equal area to house all of the exhibits that are contained in these four units, which are approximately 20,000 square feet." Epstein (a real estate appraiser) said flatly: "They don't need all of that space for a museum."

The present buildings include an apartment as a residence for the curator. The City's architectural plans for its proposed "replacement" building omit such space entirely. The architect, Codd, testified: "I do not have any place for the curator to live in the building I designed. That could be accommodated by a penthouse which is not shown in my drawings. I do not look at the curator as a guard." Engineer Kuehl cooperated with Codd in preparing and testifying about these plans, though he, too, was aware of the existence of a curator's apartment in the condemned buildings. Witness Schlaes made no mention of a curator's apartment in his proposed "replacement" buildings. Witness Epstein, in describing his proposed 20,000 square foot building (including a partial basement and similar in general outline to that of the City's architect) stated that living quarters for the curator would be included. He did not, however, explain how this could be done, the only inference being that the exhibition space in the architect's plan would have to be cut down.

The City's witnesses' treatment of cubic space for exhibition purposes is exemplified by their testimony concerning the medieval armor exhibit. Codd said that the building he designed would have 12-foot ceilings on both floors; that he did not measure the height

261

of any exhibits in the Harding Museum, the highest of which (horse and rider) he estimated at 9 feet; that his design included a "Great Hall" of about 700 square feet with a two-story ceiling of 24 feet to accommodate the exhibit of armored knights mounted on horses.[3] Kuehl testified that "the horse exhibits would look perfectly well under a 12-foot ceiling provided that you didn't put them on a platform. They are on platforms now but they don't have to be. You could put them on the floor or on a 6-inch platform." He also said that high ceilings are uneconomical as to both heating and decorating costs. Epstein estimated that the horse and rider exhibits were 9 or 10 feet high and would fit under a 12-foot ceiling "if they weren't on some dais type of platform, possibly." He, too, however, testified that he had not measured any of the objects in the museum. Schlaes also had not measured any exhibits. He thought the mounted riders were 7½ to 9 feet high. Only defendant's witness Otlewis testified to having measured these exhibits. He said the highest was 15 feet 10 inches from the floor to the tip of the lance which was positioned not straight up but on an angle; two others were 13 feet high. They stood on pedestals 18 to 24 inches high.

---

[3] There were ten or more of the full-scale horse and rider exhibits. Could they be accommodated, with room for the viewing public to walk around them at an appropriate viewing distance, in a space of 700 square feet (a square of approximately 26½ feet on a side)? When Codd testified to the 700 square feet, he was apparently attempting to minimize the extent to which the high ceiling of his "Great Hall" would cut down the floor space of the second floor. On his drawings the size is indicated as approximately 34' square, or 1,156 square feet. While this is substantially more than 700 it may still be questioned, in the absence of explanation, how this space could properly display ten or more mounted rider exhibits.

The City's advocacy of 12-foot museum ceilings seems strange, indeed, under these circumstances. That it was not inadvertent, however, is demonstrated by the City's witness McCann. Obviously for the purpose of showing that the proposed ceilings were adequate McCann, an amateur photographer, was sent to the Art Institute to take Polaroid pictures. He testified: "The ceiling height varied, I would say, from 8 feet to possibly 12, a few higher. There was a good variance. In the main stairwell area it was substantially higher." Yet defendant's witness McNab, Director of the Art Institute, testified that in its 96 galleries most of the ceilings were between 15½ feet and 20 feet high, with some 25 to 25½ feet and some as low as 14 feet, with only a few special galleries in the decorative arts department having ceilings under 14 feet.

McNab also described the display of armor at the Metropolitan Museum in New York.[4] He related that it is in a room 200 feet long with a ceiling 40 or 50 feet high; that the walls are simulated stone not unlike the Harding castle construction; and that some of them are covered with fabric similar to that in the Harding Museum. In this regard it should be noted that the Harding building containing the armor is a simulated ancient castle, a desirable background, according to McNab, for display of the medieval material—a view shared by New York's Metropolitan Museum. On the other hand the City's real estate broker-appraiser Epstein testified: "The castle is consistent with the display according to the way Mr. Harding wanted to display it. My primary disagreement is the way Mr. Harding chose to display it." Further

---

[4] He said that the Metropolitan has the only collection comparable to the Harding armor but that the latter was more complete.

on the other hand, Codd, the City's architect, testified that it is inappropriate to design a structure in the period of the setting because it is not an authentic backdrop for the exhibition; that a more authentic Norman castle would have a moat and drawbridge, guarded gates, and, instead of the imitation parapet, it should have more of an embattlement with cannon stations mounted on the roof.[5]

McNab also testified that some of the painted and stenciled ceilings in the Harding buildings were considered by him as objects of art, and that it would be impractical to attempt to move them. The City's real estate broker-appraisers nevertheless were permitted to testify that they gave no particular value to the painted ceilings, but treated them as ordinary ceilings. As stated by Schlaes: "I don't regard those ceilings as art objects. I wouldn't have them in my home."

The City also proposed "replacement" of travertine marble staircases with wood or possibly steel staircases. The attic space was to be eliminated completely from consideration as to compensation because it "would not be a good place to store art objects," according to one of the City's real estate appraisers. The wall interiors in the Harding buildings were to be "replaced" not with the kind ordinarily found in a museum but with concrete blocks which could be painted. McNab pointed out that it is possible to hang pictures on a concrete block wall but that it would break and require repair every time a nail was put in. He testified: "I know of no museum that has a concrete wall constructed in any gallery in which it is proposed to display any kind of work of art. They might have it in the storage area or basement, as we do, but you certainly wouldn't have it in the galleries." The City's engineer witness conceded on cross-exami-

---

[5] Cannon on a Norman castle?

nation that concrete block interior walls "are used in automobile showrooms, gasoline stations, office portions of factories, and in some cases, where a man wants his basement of a dwelling finished, sometimes we use them there."

In concluding their testimony, three of the City's witnesses gave their separate opinions as to the cost of construction for the proposed "replacement" building as follows:

| | | |
|---|---|---|
| Epstein | — | $240,000 |
| Kuehl | — | 240,019 |
| Schlaes | — | 240,000 |

Codd did not make an estimate.

■ As indicated above, the City's evidence bore exclusively on the cost of constructing a building to "replace" a part but not all of the space (square and cubic) occupied by the present buildings. It was variously described as "replacing" the "exhibited space" or "to house all of the exhibits," etc. It did not purport to include space areas or volume in the present buildings which the City's witnesses considered were "wasted space" or which were not, in their opinion, being used currently for museum purposes. Here the replacement theory of valuation must recognize the value of unused parts of the premises on some basis. And it would seem that to consider such space as museum storage or workshop space would be the only appropriate basis by analogy to the rule that value must be fixed with a view to the highest and best use to which the property is available, even if it is not being put to such use at the time of taking. Department of Public Works v. Barton, 371 Ill 11, 16, 19 NE2d 935; City of Chicago v. Harbecke, 409 Ill 425, 429, 100 NE2d 616; Department of Public Works & Bldgs. v. Lambert, 411 Ill 183, 189, 103 NE2d 356.

■ Entirely apart from the question of whether a museum needs room for expansion of exhibit, storage and workshop space, the fact remains that the City proposed no compensation on any basis whatsoever for the substantial portions of defendant's buildings which it opined were not needed for museum purposes. In other words, it proposed to take some 9,000 square feet and some 235,000 cubic feet of building space without paying anything therefor. In Central Illinois Light Co. v. Nierstheimer, 26 Ill2d 136, 140, 185 NE2d 841, the court decided that opinions expressed by certain valuation witnesses were incompetent and on account thereof reversed the trial court's compensation award. The court said:

> It is settled that where opinions of witnesses in condemnation cases are based in part upon elements of damage which cannot legally be taken into consideration as well as upon elements which could properly be taken into consideration, these opinions do not form a proper basis for a verdict.

A different facet of the same reasoning applies to the case here. It is our opinion that the valuations of the City's witnesses were based in part upon elements of damage which could properly be taken into consideration, but at the same time they excluded other elements which should also have been considered. Thus, as in Nierstheimer, these opinions could be taken as not forming a proper basis for a verdict.

Simply on the basis of this outline of the City's evidence—the "replacing" of more with less—it seems to us that the City has failed to meet its burden of introducing competent evidence to prove the value of all of the property to be taken. And without such proof the "just compensation" requirement of the constitution cannot be satisfied.

It might be possible to consider that when a witness, in testifying to the cost of a replacement building, gives his opinion that parts of the old building are not needed for a museum, he is saying in effect that the old building is functionally obsolete to that extent. To the extent that this may have been true it would have resulted in a double depreciation for obsolescence in the instant case, however, because the City's valuation witnesses also testified expressly to a depreciation factor for obsolescence to be applied to their estimate of construction cost for the proposed "replacement" building.[5a]

We have recited a considerable portion of the City's evidence because we believe it raises an important question concerning competence of valuation witnesses. We are aware of the frequently stated concept that a witness need not be an expert to testify to the value of real estate in eminent domain proceedings; that market value of land is a question of fact like any other, and that it may be proved by any person who has knowledge of real estate values and is acquainted with the property in question. The County of Cook v. Holland, 3 Ill2d 36, 46, 119 NE2d 760; Trustees of Schools v. Schroeder, 23 Ill2d 74, 78, 177 NE2d 178. Further, that lack of experience goes not to the competency of such a witness but only to the weight to be given to his testimony. Illinois Power & Light Corp. v. Talbott, 321 Ill 538, 543, 152 NE 486.

---

[5a] Some serious confuson may well have existed on this point. For example, witness Epstein testified that he applied a 20% functional obsolescence factor to his estimated cost of a "replacement" building which would have 20,000 square feet, or "slightly more than is being used now for the function of the present museum." He also testified: "The basement and attic were not used for the public and I think they are *functionally obsolete*. Climbing up almost four flights of stairs is certainly ridiculous, in my opinion, for a museum."

The City contends that these principles are determinative of the problem with which we are confronted in the case at bar. We think not. It is our view that when the courts have said that a witness need not be an expert they have, nevertheless, gone on to lay down qualifications which he must have if his opinions are to be admissible on the question of value. These prerequisites would seem to us to make of him somewhat of an expert, or one with only limited expertise, perhaps, but we do not intend to become involved with semantics. Our study of the cases as applied to the instant case has convinced us that there are certain competency qualifications to be met before valuation testimony may be received and that the City's witnesses did not meet these requirements.

■ Returning to the authorities relied on by the City, the Holland opinion, at page 46, quotes with approval from Department of Public Works & Bldgs. v. Bohne, 415 Ill 253, 264, 113 NE2d 319, as follows:

> . . . it is established that in condemnation proceedings the value of land is a question of fact to be proved the same as any other fact, and any person acquainted with it may testify as to its value. It is not necessary that a witness be an expert, or be engaged in the business of buying and selling the kind of property under investigation.

Continuing in the Bohne opinion, however, the very next sentence quotes in turn from an earlier opinion:

> "Any person may testify in such cases who knows the property and its value for the uses and purposes to which it is being put." People ex rel. McDonough v. Goldberg, 354 Ill 423, 429; Illinois Power and Light Corp. v. Talbott, 321 Ill 538.

Thus a full statement of the rule shows that a competent witness must not only be familiar with the property, but must also know its value "for the uses and purposes to which it is being put."

After its quotation from Bohne, the Holland opinion continues:

This is admittedly the law in Illinois, but it cannot be construed to mean that a witness is qualified to state his opinion without some preliminary showing being made as to the matters upon which he bases his opinion. . . . The matter of the qualifications of a witness in a condemnation proceeding was adequately stated in Mauvaisterre Dist. v. Wabash Railway Co., 299 Ill 299, at page 315: "While the question of the competency of witnesses is left largely to the discretion of the trial judge, there is no presumption that a witness is competent to give an opinion, and his competency must be shown. It must appear that he has some peculiar means of forming an intelligent and correct judgment as to the value of the property in question, or the effect upon it of a particular improvement, beyond what is presumed to be possessed by men generally. [Citation.] To entitle a witness to testify to the value of a thing which is of such a nature as to have a current or market value, he must be acquainted with the value of things of the class to which the thing whose value is in question belongs." Certainly, more must be required of a witness than the categorical statement that he is familiar with the property before he will be permitted to testify as to value, and this is especially so in a case such as this where an effort is being made to prove that the land is adaptable to a special use.

It would be a mistake to forget that we are dealing here with a most unusual situation, one in which a witness is permitted to state to the jury his opinion of value, when the duty of the jury itself is to determine the appropriate compensation. Surely such a witness must present some kind of credentials to justify his competency to express an opinion under these circumstances. If he knows no more than the jury about the facts in issue, then it would be an improper interference with its function for him to give his views on valuations.

The Supreme Court recognized this necessity of superior knowledge in Trunkline Gas Co. v. O'Bryan, 21 Ill2d 95, 98, 171 NE2d 45:

> The question of the market value of real property has been said to be one of fact, not of art or science (Illinois Power and Light Corp. v. Talbott, 321 Ill 538,) and, accordingly, the simple rule to determine the competency of a witness to testify to values in a condemnation proceeding has been that the witness must have some peculiar means of forming an intelligent and correct judgment as to value, or the effect upon it of a particular improvement, beyond what is presumed to be possessed by men generally.

So the conditions to competency as expressed in Mauvaisterre were held to be still authoritative forty years later.

 In the O'Bryan case the court then proceeded to break down the questioned testimony into different subject-matters, and found that the witnesses were incompetent to testify on some phases of the matter before the court, but competent as to others.[6]

---

[6] The court agreed with the trial court that the witnesses, who were farmers in the area, were incompetent to express opinions upon the effect a pipe line would have on drainage or upon the

This we believe to be true of the City's witnesses in the case at bar. Assuming that these witnesses were qualified generally to testify to real estate values in the area, that they were familiar with the property being condemned and with the costs of construction, it would follow that they could then testify to construction cost (and depreciated value) of a replacement building substantially equivalent to the old buildings in size (area and volume) and type of construction. But it would not necessarily follow that they could express an opinion that a smaller building or one of a different construction type would be an adequate "replacement" for the existing museum buildings. To do so would require a knowledge of museums and the exercise of a judgment based on such knowledge. We believe that the testimony set forth above demonstrates that the City's witnesses repeatedly gave opinions or estimates which were "museum judgments." Such testimony was, in consequence, incompetent and inadmissible unless the record shows these witnesses to have had a "peculiar means of forming an intelligent and correct judgment" in the museum field "beyond what is presumed to be possessed by men generally." Trunkline Gas Co. v. O'Bryan, 21 Ill2d 95, 98, 171 NE2d 45. We shall therefore examine the record to see what were the qualifications of these witnesses in regard to museums which could justify communication of their opinions to the jury.

Epstein (an appraiser) testified: "I have never appraised a museum before. . . . In my evaluation of this property I considered this property as a museum. I did not compare it with the valuation of any other

---

dangers of leakage, but (contrary to the trial court) found that they were competent to testify as to the manner in which the excavated area would cause farming inconveniences affecting value.

271

museums because I have no knowledge of the sale of any other museums. . . . I have no experience in designing a museum."

Schlaes (also an appraiser) said: "I have never appraised a museum. . . . I have had experience in building buildings but not museums. . . . I have had no experience in the building and management of museums. I am not a museum expert."

Kuehl (an engineer) testified: "I have never done any work on a museum. . . . I have been familiar with that structure (the Harding Museum) for ten or fifteen years." On cross-examination he said: "My fifteen-year familiarity with this structure is from driving by it. I had not been inside the property in those fifteen years. . . . I haven't designed any museums."

When it came to Codd, the architect, the City made a modest obeisance to the need to qualify him in regard to museum knowledge. The following was elicited from him on direct examination: "I have made a study of museum construction and museum architecture. I followed the construction of the Museums of Science and Industry, the Natural History Museum and the Shedd Aquarium. I followed the additions to the Art Institute." On cross-examination, however, he testified: "I was a student in high school when I followed the construction of the various museums. I was a sidewalk superintendent."

As to this phase of the case we conclude that it was an abuse of discretion to permit the City's witnesses to give opinions necessarily based on a knowledge of museums when in every instance it affirmatively appeared that such knowledge was lacking. The "experts," in effect, disavowed expertise. See Panepinto v. Morrison Hotel, Inc., 71 Ill App2d 319, 218 NE2d 880.

 On a new trial it is virtually certain that there will be testimony as to depreciation so we shall comment on another matter of arithmetic. The City's witnesses testified to two kinds of depreciation as applicable to this case: physical and functional. One witness, for example, gave it as his opinion that a physical depreciation factor of 50% should be applied to the present buildings.[7] He also applied a factor of 20% for functional depreciation, more often referred to as obsolescence. Here is where we disagree with his arithmetic because he then added the two percentages and applied a 70% total depreciation to the estimated replacement construction cost. We believe the correct way to apply more than one depreciation factor is to make the computations one at a time. Taking a cost of $240,000 with a 50% physical depreciation the amount would be lowered to $120,000. Then applying 20% obsolescence the figure would be reduced to $96,000—not $72,000 as was done at the trial. If the two factors had each been 50%, the witness' method of computation would have reduced the depreciated value to zero—an obvious error under the facts of the hypothesis. (Which is not to say that under different facts a building might not have a value of zero.) The City's other real estate appraiser used the same arithmetical method (but with different depreciation percentages) and arrived at precisely the same depreciated value.[8]

Also in regard to depreciation, most of the witnesses treated the obsolescence factor as that applicable to museum buildings, which is proper. The City's

---

[7] He made no attempt to distinguish between the depreciation factor applicable to the 75-year-old converted residence, and that applicable to the castle-like structure which was built in 1927.

[8] Curiously, he made allowance for the difference in age of the buildings but none for the difference in their size.

engineer, however, in testifying to obsolescence of the converted residence building said: "By obsolescence I mean high ceilings and the number of rooms that you have in that dwelling. You can't get anybody to work in these dwellings anymore. People don't want those because they can't get the servants." Without expressing an opinion, we simply point out that the features which might render a residence functionally obsolete could make it more valuable as a museum, or the converse might be true.

Other points have been raised by defendant, particularly in regard to alleged error in the striking of defendant's evidence relating to reproduction. Under the circumstances, these contentions need not be considered in reaching our decision on this appeal.[9] Nor shall we extend this opinion to express our views thereon because it seems probable that the testimony on both sides in a retrial would be quite different in character.

The judgment of the Circuit Court is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

McCORMICK, P. J. and DRUCKER, J., concur.

---

[9] We do not mean to indicate that some of these points were not well taken. For example, after all proofs were closed the City's attorney moved to strike the testimony of defendant's witness Olson. Despite the fact that no appropriate objection had been made when Olson's testimony was being put in, the motion was allowed. This was error (General Motors Acceptance Corp. v. Elder, 24 Ill App2d 55, 62, 163 NE2d 721; Western Union Telegraph Co. v. Hope, 11 Ill App 289, 292; Reule v. City of Chicago, 268 Ill App 266, 273) of more than ordinary importance, coming as it did when the case was about to go to the jury and defendant was no longer in a position to rehabilitate its case through the same or other witnesses.

SUPPLEMENTAL OPINION ON REHEARING.

The City's argument on rehearing rests heavily on the proposition that our opinion required replacement of the buildings taken with a "special purpose" museum building rather than a building appropriate to the "special use" of a museum. We think not. In fact, we consider that the City's contention would have us ignore completely the factor of suitability for museum use simply because the old buildings were not "special purpose" structures. If a replacement building were not to be capable of accommodating the special use to which the old buildings had been put, then the entire basis of evaluation agreed upon in the trial court would be improper. The fair market value would be the standard in that situation.

The City also contends that its witnesses were competent to testify in regard to a replacement building suitable for the special use of a museum because of their experience in designing, building or appraising other types of special use buildings. We are not convinced. Knowledge of special purpose or special use structures housing theaters, garages, stores, etc., does not qualify a witness to give his opinion concerning a building to house a museum.

With minor modifications (which have been made) we adhere to our original opinion reversing the judgment and remanding the cause for a new trial.

Reversed and remanded.

DRUCKER, P. J. and McCORMICK, J., concur.