THE PEOPLE *ex rel.* THE DIRECTOR OF FINANCE, Petitioner-Appellant, *v.* YOUNG WOMEN'S CHRISTIAN ASSOCIATION OF SPRINGFIELD *et al.*, Defendants-Appellees.

Fourth District   No. 14637

Opinion filed April 14, 1978.

GREEN, P. J., concurring in part and dissenting in part.
TRAPP, J., dissenting.

William J. Scott, Attorney General, of Springfield (Raymond L. Terrell, Assistant Attorney General, of counsel), for appellant.

Carol O. Hoffee and Richard C. Edwards, both of Barber & Barber, of Springfield, for appellees.

Mr. JUSTICE WEBBER delivered the opinion of the court:
This matter comes to use as an interlocutory appeal by our permission under Supreme Court Rule 308 (58 Ill. 2d R. 308) from the circuit court of Sangamon County. It concerns the proper method of valuation, and hence the type of evidence to be introduced at trial, of the building and land belonging to the Young Women's Christian Association (YWCA) in the City of Springfield.

In brief, the background is this—the Capital Development Board of the State of Illinois, pursuant to proper authorization and appropriation of funds by the General Assembly, is in the process of acquiring the necessary lands, rights and property in Springfield for the erection of a courts complex, which will be located immediately north of the Governor's Mansion on the block bounded by Capitol Avenue on the north, Fifth Street on the east, Jackson Street on the south and Fourth

Street on the west. The complex will house the Circuit Court of Sangamon County, the Appellate Court for the Fourth District, and facilities for legal and paralegal public education. The YWCA's land and building is located on a portion of this block and has existed there since about 1910.

No questions in this appeal are raised concerning the authority of the petitioner to condemn nor the necessity for condemnation. What is at issue is the method of valuation. It arose upon the filing by the petition of a motion *in limine* seeking to prohibit the YWCA from introducing at trial any evidence of the cost of replacing or reconstructing its facilities. The basis for such evidence would be a finding that the YWCA constitutes a "special use" under the law and thus is not bound by the usual rule of fair cash market value.

The YWCA answered the motion and after describing the charitable nature of its activities, alleged, among other things, that its building "is a unique special purpose building" and therefore it is entitled to sufficient compensation to create "substitute facilities."

The trial court held a hearing on the motion and held in substance that the YWCA was entitled to be compensated on the basis of substitute facilities, that is, the cost of acquiring a comparable lot and erecting thereon, without regard to depreciation, a building suitable for its charitable purposes. As a part of its order, the trial court certified to us, under Rule 308, the following questions:

(1) Whether, under the evidence given at the hearing on the Motion and Answer thereto, the use and ownership of the property are such that the just compensation to be awarded for the taking of said property is the fair cash market value of the property at its highest and best use on the date of the filing of the Petition, or whether the fair cash market value is not the legal standard for determining just compensation because the property is of such nature and applied to such special use that it cannot have market value.

(2) Assuming that the property in question is of such a nature and applied to such special use that it cannot have a market value, whether the proper standard for determining just compensation is substitute facilities cost without regard to depreciation.

(3) Assuming that the property is subject to the special use rule and assuming that depreciation is not a proper factor to be considered in determining just compensation, whether the cost of substitute facilities should be based on cost of reproducing the existing facilities.

■■ As to question No. 1, we find that the YWCA is not a special use and that the usual rule of fair cash market value on the date of filing the

petition applies to it. Such a finding renders moot answers to questions No. 2 and No. 3.

■■ It is now beyond debate that the concept of special use is firmly embedded in Illinois' law of eminent domain. As long ago as 1881 it was a judicially recognized doctrine and Public Act 77-1904, effective July 1, 1972, added section 9.7 to the Eminent Domain Act (Ill. Rev. Stat. 1975, ch. 47, par. 9.7). That section deals with the definition of fair cash market value, but opens by saying, "Except as to property designated as possessing a special use, \* \* \*." In a learned note in 1973 University of Illinois Law Forum 449, 452, counsel for the YWCA argues that the language is surplusage, but even so, it places the imprimatur of the General Assembly on the existence of the theory. The abiding problem, lacking a legislative definition, is—what are the limits of the theory? Section 9.7 tells us only that fair cash market value is not to apply to a special use, and as the author states in 1973 University of Illinois Law Forum, it never did anyway.

■■ Prior Illinois decisions have tended to treat the matter on a case-by-case basis with some dicta which have only made more obscure any general standard. An example of the latter is contained in *City of Chicago v. Farwell* (1918), 286 Ill. 415, 121 N.E. 795. The court was dealing with a soap factory, but went on to say:

"There are a few exceptional cases in which market value cannot be the legal standard because the property is of such nature and applied to such special use that it cannot have a market value, such as a church, college, cemetery, club house or terminal of a railroad." (286 Ill. 415, 419-20, 121 N.E. 795, 797.)

This language is often cited as the usual list of special uses in Illinois. (See, for example, *River Park District v. Brand* (1927), 327 Ill. 294, 299, 158 N.E. 687; *Forest Preserve District v. Hahn* (1930), 341 Ill. 599, 602, 173 N.E. 763; *Forest Preserve District v. Lehmann Estate, Inc.* (1944), 388 Ill. 416, 424, 58 N.E.2d 538.) Significantly, later cases omit mention of club houses and cemeteries and substitute "school" for "college." See *Housing Authority v. Kosydor* (1959), 17 Ill. 2d 602, 606, 162 N.E.2d 357, 359; *Peoples Gas Light & Coke Co. v. Buckles* (1962), 24 Ill. 2d 520, 532, 182 N.E.2d 169, 176.

The railroad cases are of little assistance in that in nearly every instance it was a situation of one body with the power of eminent domain taking property of another with similar power. *Lake Shore & Michigan Southern Ry. Co. v. Chicago & Western Indiana R.R. Co.* (1881), 100 Ill. 21, involved the compensation to be paid by one railroad for taking intersects on the line of another. A prior proceeding (*Lake Shore & Michigan Southern Ry. Co. v. Chicago & Western Indiana R.R. Co.* (1881), 97 Ill. 506) held that the delegation by the General Assembly of the power of

eminent domain to railroads for such a purpose was constitutional. The thrust of the decisions appears to be that when one railroad takes another's property, it must pay railroad-money-worth, not market value. The same situation obtained in *Chicago & Northwestern Ry. Co. v. Chicago & Evanston R.R. Co.* (1884), 112 Ill. 589.

The facts took on a slight variation in *Sanitary District v. Pittsburgh, Ft. Wayne & Chicago Ry. Co.* (1905), 216 Ill. 575, 75 N.E. 248. While it was again one body with eminent domain power condemning another with like power, the court followed the railroad cases above, holding railroads to be special uses, but let stand a verdict which was slightly over 20% of the railroad's evidence.

The latter-day descendant of the railroad vs. railroad cases appeared in *County of Cook v. City of Chicago* (1967), 84 Ill. App. 2d 301, 228 N.E.2d 183, wherein one entity of government was condemning another. The court followed the theory that when the condemnee is legally obligated to substitute its condemned facilities (in that case, a school), the condemnor must pay for such substitution, that is, replacement cost, not fair cash market value. The court quoted with approval from *State v. Waco Independent School District* (Tex. Civ. App. 1963), 364 S.W.2d 263, 268, as follows:

> "There is a fundamental distinction between obligation resting on the agency condemning public property, and that of condemning private property. This distinction lies in the obligation thereby imposed on the condemnee. For example, a private party owes no duty to the public to continue its operation either at its original location or elsewhere. It can move, it can stay, or it can liquidate as it alone sees fit. Not so with a school system charged with a legal obligation to the public."

This doctrine was broadened in *United States v. Certain Property* (2d Cir. 1968), 403 F.2d 800. In that case the court held that "legal" necessity may not be the only test in a public body vs. public body case, saying, "The duty may be legally compelled or one which arises from necessity [citation]; the distinction has little practical significance in public condemnation." (403 F.2d 800, 803.) The court remanded for a new trial since the district court applied only the legal compulsion test.

We do not find these cases persuasive, since they all involve one entity possessing the power of eminent domain condemning a similar entity. The case at bar involves a public body condemning a charitable organization.

No Illinois case involving a church, a college, a cemetery or a club house has been cited to us in which an Illinois reviewing court has held the subject matter to be a special use. Perhaps the closest case factually to the

instant case is *City of Chicago v. George F. Harding Collection* (1965), 70 Ill. App. 2d 254, 217 N.E.2d 381, wherein the city undertook to condemn a museum. This case is of little assistance to us since both sides treated the matter as one of replacement cost and the chief contention was over the expertise of the witnesses. The *Harding* court was not called upon to define a special use. In a footnote, Mr. Justice English refers obliquely to a distinction between a "special purpose" and a "special use" building, but the matter was not necessary to the decision and was not directly passed upon.

We then come to the fundamental question to be faced in this case— can there be laid down a generic definition of a special use, apart from the specific examples given by *Farwell* and subsequent cases? We believe the answer is to be found in *Kosydor* and *Buckles*. In *Kosydor*, Mr. Justice Schaefer said:

> "The value to the owner of the property taken or damaged for his particular purposes, or its value to the condemnor for some special use, have been rejected in favor of the 'market value' of the property at the highest and best use to which it is adapted. [Citations.] This objective standard has been adopted in most jurisdictions. [Citation.] Generally, exceptions occur only when property has special capabilities which make it unmarketable at its true value due to unique improvements, such as a church, a school or a railroad terminal. [Citations.]" (17 Ill. 2d 602, 606, 162 N.E.2d 357, 359.)

This language was quoted almost verbatim in *Buckles* at pages 531-32.

We note the emphasis on "special capabilities" and "unique" improvements. We believe that in referring to "exceptions" the reference was to "market value" not to the objective standard. It therefore follows that the special capability must exist in the property itself and not in the value to the owner or the condemnee. Viewed in this light, the special use is a highly restricted doctrine. Examples would be a "grandfather clause" as was found in *United States v. 564.54 Acres of Land* (3d Cir. 1974), 506 F.2d 796, commonly called the "*Lutheran Synod* case"; or the perpetual exemption from taxation as is found in the special charters of certain institutions, granted by the General Assembly prior to the general corporation act; or a tract of land possessing irreplaceable flora or fauna, as does the virgin prairie bog found near Chicago or the habitat of the snail darter fish, much in recent environmental controversy.

In speaking of "unique" improvements, the scholarly Mr. Justice Schaefer can only be assumed to have used the word in its true sense. Webster's Second International Dictionary defines it as: "1. single, sole. 2. Being without like or equal; single in kind or excellence; unequaled;

hence, loosely, unusual, notable." Even the loose definition would admit of only a few structures, principally those having historic value, such as a Frank Lloyd Wright house, the Old Capitol in Springfield, Holy Name Cathedral in Chicago or The Water Tower.

Applying these principles to the instant case, we find that the record falls short of placing the YWCA in the special use category. It discloses only that the YWCA is a charitable organization, devoted to good works, but not essentially different from thousands of other similar charities. It possesses no special charter privileges nor other inherent qualities which would give it a special capability as defined in *Kosydor* and *Buckles*. Its building has only two features which could arguably make it unique—a swimming pool and heavyload bearing floors suitable for gymnastics. Such a description in the abstract would fit literally thousands of buildings.

The YWCA's principal argument, as we understand it, is that a charity, per se, is entitled to special use treatment. The argument is bottomed on an extension of the *Lutheran Synod* case mentioned above.

*Lutheran Synod*, as we read it, stands alone without pride in ancestry and without progeny. After concluding that the substitution rule could apply to nonprofit community facilities in an "appropriate case," the circuit court did not apply the rule to the case, but remanded after the interlocutory appeal. We thus do not know whether the facts presented did, or did not, constitute an appropriate case. The presence of the grandfather clause, mentioned above, is a fair indication that it probably was. In any event, decisions of the Federal courts of appeal are not binding on this court. *People v. Spahr* (4th Dist. 1978), 56 Ill. App. 3d 434, 371 N.E.2d 1261.

Our chief quarrel with the discretionary approach of the *Lutheran Synod* case is the introduction of totally subjective criteria into the method of determining a special use. If every nonprofit organization in Illinois (we are informed that there were 41,778 of them as of December 28, 1977) were to obtain the benefit of special use treatment simply by virtue of being nonprofit, both judges and juries would be called upon to pick and choose their favorites and disfavorites. As we understand the rationale of *Lutheran Synod*, the effort is to replace services lost to the community at large. While nearly everyone might agree on the worth of a YWCA, could the same be said about a Muslim mosque or a club house of the American Nazi Party?

The trial court in the initial instance will be called upon to decide what evidence will go to the jury and at this point, under *Lutheran Synod*, it must make a value judgment on the organization. If a judge is prohibited by Supreme Court Rule 64 (58 Ill. 2d R. 64) from participating in charitable affairs, how in good conscience can he be called upon to grant

favored status to one charity and not to another in deciding a question of law?

With a jury making the assessment of damages, the problem becomes even more compounded. It is conceivable that a nonprofit organization, disfavored by a jury, might not receive anything more than the minimum, while the favored one would rest near, or at the top of the evidence.

Such would be the case by opening the flood gates of discretion as suggested by *Lutheran Synod*. By giving both judge and jury an objective standard from which to work, much mischief will be avoided.

Emotions run high during an eminent domain proceeding. No one enjoys having his property wrested from him by the sovereign. It flies in the face of the belief that the home is the castle and to a large extent it undermines the ancient theory upon which courts of chancery centuries ago developed the action of specific performance, *viz.*, that each piece of real estate is *sui generis* and hence not compensable by an action at law for breach of contract. It is difficult enough when only one owner is subjected to eminent domain but all the problems and emotional trauma escalate accordingly when an institution like the YWCA, having over 5,000 members, whose lives will be affected, is involved.

But none of this is sufficient reason to abrogate rules of law in order to adjust equities. The power to condemn is constitutionally granted to the State by the people and is held in check by the requirement of just compensation. "Just" does not mean "fulsome" solely to avoid a capital funds drive. In this case it means fair cash market value.

This appeal has created a sharp division of opinion within this court. The writer would reverse and remand with directions to the trial court to limit valuation evidence to fair cash market value. Mr. Justice Green, as is shown by his partial concurrence and dissent, would likewise reverse and remand but would allow evidence of replacement value subject to depreciation. Mr. Justice Trapp would likewise reverse and remand, as is shown in his partial concurrence and dissent, but only in order to expand the range of the evidence on replacement.

The concensus of this court, then, is a reversal and remandment but for varying reasons. Under ordinary circumstances in such a situation, the entire appeal would be submitted to a new panel in order to obtain a greater unanimity of opinion. However, all of the other members of this court have recused themselves from this case for varying and valid reasons. Therefore, only this panel can effect a disposition.

The judgment of the circuit court of Sangamon County is reversed and the cause is remanded for further proceedings in accordance with the views expressed herein.

We are aware that this mandate will impose almost insuperable problems for the trial court. Therefore, this court, on its own motion, and

pursuant to article VI, section 4, of our 1970 Constitution, enters a certificate of importance to the supreme court.

Reversed and remanded with directions.

Mr. PRESIDING JUSTICE GREEN, concurring in part and dissenting in part:

As stated by Mr. Justice Webber, I concur in the decision to reverse the interlocutory order of the trial court and to remand. I also concur in the decision to issue a certificate of importance. I agree with Mr. Justice Webber that the "substitute facilities" measure of just compensation is not correct for use in this case. I disagree with him, however, in his conclusion that "actual fair cash market value" is the correct measure.

The State constitutional authority for taking private property for public use (Ill. Const. 1970, art. I, §15) requires that the entity whose property is taken not end up poorer because of the taking. (*City of Chicago v. Koff* (1930), 341 Ill. 520, 173 N.E. 666.) Public policy also requires that the entity does not end up richer. (*Department of Public Works and Buildings v..Hubbard* (1936), 363 Ill. 99, 1 N.E.2d 383.) In a case of this nature, the determination of a measure of damages that will meet both of these requirements is, obviously, most difficult.

I conclude that application of the fair cash market value rule to this case would inevitably result in the condemnee here ending up much poorer as a result of the condemnation. In the absence of an Illinois case directly in point, I consider the cited dictum from *Kosydor* to be the most definitive statement available. However, I do not agree that Mr. Justice Schaefer intended that only the very unusual church, school or terminal come within the exception to the market value rule. Rather I consider the opinion to clearly state that churches, schools and terminals are the types of buildings which, because of the "special capabilities" brought about by their "unique improvements" are "unmarketable" at "true value." The obvious reason that such properties are unmarketable at their "true value" is the absence of prospective purchasers who can utilize the special capabilities of the properties. I recognize that most commercial structures, such as the factory in *Farwell* have improvements that few prospective purchasers can fully utilize but a reasonable use can usually be made and market value is a fair measure of compensation. I know of no ruling or dictum of a reviewing court that would limit the exception to the market value rule to properties of historical significance or those enjoying special legal privilege.

The Y.W.C.A. building in question had a swimming pool, a gymnasium, a chapel, and several large meeting rooms as well as three

kitchens. The floors of several of the rooms were reinforced so that they could be used as a gymnasium. The capabilities of these unique improvements could only be utilized by an organization like the Y.W.C.A. which combines worship with athletic, cultural and community endeavors. Other than the Y.M.C.A., there are few, if any, organizations in most communities of similar size with a similar combined program. It is hard enough to sell most older downtown multistory buildings. It is obvious that on the open market this property would sell at a price that would have little, if any, reflection of the true value of the combined capabilities of the property. Its market value would be as unrelated to its true value as would be the case with a church, school or terminal.

No Illinois decisions have extended the "substitute facilities" rule for determining compensation to a charitable entity. I do not deem it to be constitutionally mandated and I agree with Mr. Justice Webber that determining fairly which of the many and ever growing number of charities are entitled to its aid would be a most difficult task. Moreover, requiring the trier of fact to determine the kind of facilities that would be necessary to replace the existing ones introduces another factor of uncertainty into an already speculative procedure. Great incentive would be placed upon the condemnee to contend that it requires the most extensive new facilities. Furthermore, the substitute facilities would almost always include a new structure and the condemnee and its users would thus be getting the benefit of a new facility in place of an old one.

In the absence of Illinois precedent as to the measure of just compensation in a case of this nature, I consider the fairest measure of damages to be that agreed upon by the parties in *City of Chicago v. George F. Harding Collection* (1965), 70 Ill. App. 2d 254, 217 N.E.2d 381, where, as has been stated, the city condemned a private museum and the land upon which it stood. The parties agreed that the measure of damages would be: (1) the market value of the land taken as a separate element and (2) the present cost of reproducing a like building minus the percentage of that cost determined to be the percentage of depreciation of the existing building.

Unlike cases where the market value is the measure of damages (*Department of Transportation v. Quincy Coach House, Inc.* (1976), 64 Ill. 2d 350, 356 N.E.2d 13), this rule would permit the condemnee the benefit of a separate valuation of the land and the reproduction cost of the building. Each valuation would be far less speculative than determining the cost of acquiring suitable substitute land and erecting a suitable substitute building upon that land. In most cases where the property is unmarketable at true value because of the nature of the facilities, permitting a separate valuation for the land would obviously be a

substantial benefit to the condemnee. Consideration of depreciation, on the other hand, recognizes that the facility taken is ordinarily not the equivalent of a new one.

Upon obtaining a condemnation award, a condemnee charity is in the flexible position of being able to design a new facility to meet any changes in operations that are deemed desirable. A facility can be built having greater capacity for one type of activity and less for another type than the existing structure. Money spent on rebuilding a good heating system now may save fuel bills in the future. Ordinarily, some sort of change in the capital structure of the entity would be likely to take place. I conclude that the measure of damages agreed upon in *Harding* would make the condemnee here no poorer after the condemnation.

I would order that measure of damages to be used at trial.

Mr. JUSTICE TRAPP, dissenting:

I dissent from the conclusions severally reached in this case.

The order of the trial court finds that defendant's property is devoted to community and charitable functions. It appears that this finding is not questioned in the trial court, upon appeal, or in the opinions of the members of this court.

Mr. Justice Webber concludes that there is no special use as a matter of law and that the measure of damages is the fair market value of privately owned property. He appears to conclude that a "special use" exists only when the owner of the condemned property is legally obligated to replace the existing facility or there is some "necessity" which requires replacement. With the law so established, it is difficult to discover a reason for the legislature to enact legislation in 1972 which excepts from a market value measure of damages that "property designated as possessing a special use." Ill. Rev. Stat. (1975), ch. 47, par. 9.7.

As a second approach, Mr. Justice Webber determines that the existing structure does not possess "special capabilities" which make it unmarketable at its true value due to "unique improvements."

Mr. Justice Green concludes that the building has structural and design qualities which produce "special capabilities" from its "unique improvement" which renders it unmarketable at its true value because there are no prospective purchasers who can utilize those capabilities or improvements.

For such reason he would allow replacement costs but subtract from those costs the percentage of the depreciation of the existing building. This is actually a formula for determining compensation for a privately owned single purpose building. See Note, *Cost of Substitute Facilities As A Measure Of Just Compensation When There Is A Private Condemnee,* 1975 Duke L.J. 1133, 1142.

As I understand Mr. Justice Green he speaks essentially of a building having a particular design for a single purpose. The opinion in *City of Chicago v. G. F. Harding Collection* (1965), 70 Ill. App. 2d 254, 257 n. 1, 217 N.E.2d 381, 382 n. 1, distinguishes property designed for a special purpose from property having a special use. A "special purpose" structure is of the character of a power generating station, a gas storage facility, or a system of railway tracks.

It cannot be said that the opinion in *City of Chicago v. G. F. Harding Collection* (1965), 70 Ill. App. 2d 254, 217 N.E.2d 381, is either an authority in or properly applicable to, the question here. The evidence there presented was directed to "special purpose" buildings which the reviewing court distinguished from an award for a "special use." At most, the property is described as a "private museum." There is neither evidence nor suggestion that the property played any part as a community venture or use. As that opinion states, counsel had agreed upon the means of computing damages and the court merely found it acceptable. No issue of the proper measure of damages for the facility's use for a special use was presented or reviewed. I cannot agree that the formula provides guidance upon the question presented here.

We note that depreciation formulae function essentially as an accounting maneuver employed in computing income taxes, and perhaps, as a means of showing a profit. It has no relation to use and function. It is commonly observed that historic and public buildings which have been reasonably maintained may serve the chosen function admirably despite an age exceeding 100 years.

Each colleague turns to the cited *Kosydor* and *Buckles*. In neither opinion did the supreme court approach the issues found here. In *Kosydor* it was agreed that the highest and best use of the property was as an automobile junk yard. The method of valuation and compensation was not an issue. The question was whether the owner was entitled to compensation for moving his machinery and merchandise. In *Buckles* there was condemnation of an underground easement for the storage of gas. The owner claimed that his measure of compensation was the value of the use of the easement to the condemnor. That position was rejected.

The "special use" here concerned has been described as a "service type property" which is rarely abandoned or sold. *Newton Girl Scout Council, Inc. v. Massachusetts Turnpike Authority* (1956), 335 Mass. 189, 138 N.E.2d 769.

The determinative question is whether the public has a sufficient interest in having such nonprofit service facilities continued so that the condemnor should be required to provide an amount adequate to insure such continuation. The loss being compensated is the deprivation of the benefit of the facilities and the cost of substituted facilities is provided to

insure their continued availability. Thus, the objective is not that of compensating the owners, but in indemnifying those that have an interest in the continuing existence of the facilities so used. So it is said that:

> "[I]f a condemned facility is reasonably necessary for public welfare, then 'compensation is measured not in terms of "value" but by the loss to the community occasioned by the condemnation.' " 1975 Duke L.J. 1133, 1140.

The rationale of *United States v. 564.54 Acres of Land* (3d Cir. 1974), 506 F.2d 796 (Lutheran Synod case), is persuasively relevant to the use here presented. That opinion points out that in the context of "substitute facilities" compensation has no relationship to valuation. Rather, the community entity is "entitled to be made whole and sufficient damages must be awarded to finance a replacement facility as anything less would not afford just compensation." That opinion speaks of the obligation of the Federal Government to indemnify the not-for-profit charitable organization, and quoted from *United States v. Fuller* (1973), 409 U.S. 488, 490, 35 L. Ed. 2d 16, 20, 93 S. Ct. 801, 803:

> "The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness [citation], as it does from technical concepts of property law."

In interpreting the "taking clause" of the Constitution, the court said that there was no basis for distinguishing between government uses and the community uses of not-for-profit entities in determining the measure of just compensation. 506 F.2d 796, 801.

So the court said:

> "The community entity is entitled to be made whole, and making it whole means more than forcing it to abandon its non-profit community use and accept what it could obtain in the marketplace from a profit motivated purchaser. Simply stated this method insures that sufficient damages will be awarded to finance a replacement for the condemned facility. Nothing less would afford just compensation. * * *" 506 F.2d 796, 800.

We note that in *Lutheran Synod* the government contended that the measure of damages was the market value of the property, or alternatively, the depreciated replacement cost. Rejecting each of the alternatives, the court adopted the view that fair compensation reasonably necessary to public welfare means:

> "[C]ompensation * * * measured not in terms of 'value' but by the loss to the community occasioned by the condemnation." 506 F.2d 796, 800.

So it was said:

> "Fair indemnification in such circumstances requires compensation sufficient to provide a substitution for the unique facilities so that

the functions carried out by or in behalf of the members of the community may be continued. Depreciated replacement cost often will not permit continuation of such functions." 506 F.2d 796, 799, 800.

My colleagues express concern that the Association may be enriched by obtaining a new improvement or that there will be claim for enlarged or additional facilities. The objective to be obtained in providing a substitute facility is to provide the "functional equivalent" of the facility presently available. (*United States v. Certain Property* (2d Cir. 1968), 403 F.2d 800, 803.) There is no requirement of exact duplication. (1975 Duke L.J. 1133, 1136.) Each of the asserted hazards may be controlled by the court upon the evidence presented and the issues raised by counsel. Such method is more likely to achieve fairness in procuring the survival of the community use than a predetermined formula constructed without consideration of any facts which are relevant to the issue.

I would affirm the determination of the trial court that defendant's property functions as a special use and that just compensation requires an award sufficient to provide substitute facilities. I would reverse in so far as the trial court's order may be interpreted to fix compensation as the cost of replacing the existing brick building.