THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY LUCAS, Defendant-Appellant.

(No. 74-247; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)

Third District—October 30, 1975.

James Geis and Robert Perry, both of State Appellate Defender's Office, of Ottawa, for appellant.

Walter D. Boyle, State's Attorney, of Hennepin ( C. Joseph Weller, Assistant State's Attorney, and F. Stewart Merdian, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE STOUDER delivered the opinion of the court:

After a jury trial the defendant, Jerry Lucas, was convicted of the crimes of delivery of a controlled substance and calculated criminal drug conspiracy. He was sentenced to not less than one nor more than three years of imprisonment on the delivery count, and not less than four nor more than twelve years on the calculated criminal drug conspiracy count, the sentences to run concurrently.

The primary issue on this appeal is whether the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt of the crime of calculated criminal drug conspiracy. More specifically, we must decide whether the evidence was sufficient to prove beyond a reasonable doubt that Lucas "organized or directed" a conspiracy to deliver a controlled substance.

The People concede that it was error to convict and sentence on both the offense of delivery of a controlled substance and the offense of calculated criminal drug conspiracy because both offenses arose from the same conduct. If, therefore, the conviction for calculated criminal drug conspiracy is affirmed, the conviction for delivery of a controlled substance must be reversed. On the other hand, if the conviction for calculated criminal drug conspiracy is reversed, the conviction for delivery of a controlled substance must be affirmed.

The charges against defendant are based on a transaction between an agent of the Illinois Bureau of Investigation and one Pauley Gama, and the events leading to that transaction. The evidence against Lucas consisted of testimony by William Barrett, Special Agent with the Illinois

Bureau of Investigation, David Krug, Special Agent with the United States Treasury Department, and Chris Heart, another Treasury agent.

Barrett and Krug testified that during the period in question they were assigned to the La Salle, Putnam and Bureau County area, conducting a narcotics investigation. On the evening of August 9, 1973, while operating undercover, they met Steve Nelson and Jerry Lucas, with whom they were previously acquainted, in a park in the La Salle area. At that time Lucas and Nelson both confirmed that a meeting with Pauley Gama had been arranged for 10 p.m. that evening at the Tropics Bar concerning a cocaine purchase the agents wanted to make.

Barrett was unable to say whether it was Lucas or Nelson who first raised the subject of that meeting, or which of them had actually contacted Pauley Gama to make the arrangements. He testified that both Lucas and Nelson had told him on a number of previous occasions that Pauley Gama was the person to deal with, and that Lucas had probably been the first to offer to arrange a meeting. Krug testified that he did not get into the conversation, and knew only that Barrett, Lucas and Nelson discussed drugs and a man named Pauley.

Lucas denied he ever offered to arrange a meeting with Gama, and denied arranging this meeting. He stated that Steve Nelson and Junior Lucas (a confidential informer unrelated to defendant) had told Jerry Lucas before the meeting in the park that a "coke" deal between Barrett and Gama was in the making. When they met Barrett and Krug in the park, Barrett told Lucas that a meeting had been arranged with Gama that evening in the Tropics Bar in Ottawa, and asked Lucas to come along because Gama knew him and would accept Barrett more readily if he came with a familiar face. Lucas testified that he agreed to go along.

Barrett and Krug stated that they arrived at the Tropics Bar at approximately 10 p.m. on August 9 with the confidential informer. Nelson and Lucas were already there, and Pauley Gama arrived shortly thereafter.

Barrett testified that Nelson introduced both agents to Gama and that Nelson began the conversation with Gama by stating that the agents wished to purchase cocaine. Barrett asked Nelson about the price and Nelson related the question to Gama. The price of $1300 was mentioned, Gama made a phone call, and then indicated that the lowest he could go was $1400. Barrett asked Nelson and Lucas about the quality of the coke and they both indicated they had both tried it and would vouch for the quality.

Gama then asked if Barrett and Krug were definitely interested and Barrett indicated they were. According to Barrett, Gama asked where they could meet to complete the transaction, and at that point Lucas

spoke up and said they could meet at his house, which was in a rural setting where they "wouldn't catch any heat." Barrett and Gama agreed.

Lucas testified that he was present at the meeting in the Tropics Bar; that he took no part in the conversations; that there was a jukebox playing and he could hear only bits and pieces of the conversation; and that the extent of his conversation with Gama was to say "hi" when Gama arrived. He stated that at some point Barrett asked him if the cocaine was good and he assured him that it was. Lucas denied volunteering his house as the place where the transaction could occur. He stated that the confidential informer, who was sitting next to him in the bar, suggested that they use his place and that he agreed that this would be all right. He denied ever saying that his house would be a good place because it wouldn't catch any heat, and asserted that the expression "heat" went out with the roaring twenties.

Barrett, Krug and Heart testified that they and the confidential informer arrived at Jerry Lucas' house at approximately 1:30 p.m. on August 10. Gama had not yet arrived, and after waiting about 45 minutes, the agents became impatient and said they were leaving. Lucas made a call to Gama, but received no answer. At about 2:20 p.m., the agents began to leave, acting perturbed that Gama had not shown. Lucas began to apologize when the telephone rang. He answered it and told the agents that it was Gama and that he would be there in about 30 minutes.

Gama arrived at about 3:40 p.m. with one Joseph Diaz and announced that he was in a hurry to transact the deal. The group, consisting of Lucas, Barrett, Krug, Heart and the confidential informer, had been standing around in the front yard when Gama arrived. Barrett and Gama stepped away from the group. Gama handed Barrett the cocaine; Barrett inspected it, weighed it and paid Gama $1400.

Krug testified that during the transaction he was standing with the rest of the group, apart from Barrett and Gama, and that he had a general conversation with Lucas which he did not remember since he was concentrating on observing the transaction between Barrett and Gama.

Heart testified that he had come with Krug and Barrett to act as bodyguard. He stood a few feet from Barrett and Gama, facing Diaz (who was acting as Gama's bodyguard), with his back to the rest of the group, and the two observed the transaction.

The agents testified that Gama and Diaz left immediately and that the agents left shortly thereafter. Barrett said that as he was leaving, Lucas approached him and asked him for a sample of the cocaine, about $10 worth, but Barrett refused, and instead offered to give him some money. However, Barrett testified that he never paid Lucas in any way,

and that to the best of his knowledge, Lucas received nothing from anyone else as a result of this transaction.

Lucas testified that he did not see the actual transfer of the cocaine, and denied asking Barrett for a sample. He stated that Barrett and Krug both thanked him for the use of the house, and that the thanks was all that he received from them. He was never paid in any way. Lucas denied any part in organizing the delivery and asserted that his only role in the transaction was in agreeing to the use of his house.

Defendant was convicted of calculated criminal drug conspiracy, a violation of section 405 of the Illinois Controlled Substances Act (Ill. Rev. Stat., ch. 56½, par. 1405). That section provides as follows in relevant part:

"(b) For purposes of this section, a person engages in a calculated criminal drug conspiracy when:

(1) he violates any of the provisions of subsections (a) or (b) of Section 401 or subsection (a) of Section 402; and

(2) such violation is a part of a conspiracy undertaken or carried on with two or more other persons; and

(3) he obtains anything of value greater than $500 from, or organizes, directs or finances such violation or conspiracy."

The indictment alleged that Lucas violated section 401 (b) in that he aided in the delivery of less than 30 grams of cocaine; that the conspiracy was between Pauley Gama, Steve Nelson and Jerry Lucas; and that Lucas organized and directed the conspiracy.

Although the indictment charged that defendant organized and directed the conspiracy, the statute is phrased in the disjunctive, thus requiring proof either that the defendant organized or directed the conspiracy. Since the jury was instructed in the disjunctive, in accordance with the statute, and no objection was made to this instruction, the defendant has, in this regard, no cause to complain. Nevertheless, the question still remains whether the evidence was sufficient to establish beyond a reasonable doubt that Lucas organized or directed the conspiracy.

No contention is made that the evidence failed to establish that Lucas was accountable for the delivery of a controlled substance, or that this evidence was insufficient to show the existence of an ordinary conspiracy.

The offense of calculated criminal drug conspiracy is relatively new and has received little judicial construction. The legislative intent in enacting the Illinois Controlled Substances Act is set forth in section 100 (Ill. Rev. Stat., ch. 56½, par. 1100):

"It is the intent of the General Assembly, recognizing the rising incidence in the abuse of drugs and other dangerous substances

and its resultant damage to the peace, health, and welfare of the citizens of Illinois, to provide a system of control over the distribution and use of controlled substances which will more effectively: \* \* \* (3) penalize most heavily the illicit traffickers or profiteers of controlled substances, who propagate and perpetuate the abuse of such substances with reckless disregard for its consumptive consequences upon every element of society; \* \* \*.

It is not the intent of the General Assembly to treat the unlawful user or occasional petty distributor of controlled substances with the same severity as the large-scale, unlawful purveyors and traffickers of controlled substances. To this end, guidelines have been provided, along with a wide latitude in sentencing discretion, to enable the sentencing court to order penalties in each case which are appropriate for the purposes of this Act."

■■ The statute in question penalizes those who not only violate the possession, manufacture and delivery provisions of the Controlled Substances Act, but who do so as a part of a conspiracy with at least two other persons, and who profit thereby in the amount of at least $500, or who organize, direct or finance the violation. Consistent with the legislative intent to "penalize most heavily the illicit traffickers or profiteers of controlled substances," section 405 is designed to penalize most severely those narcotics dealers who are considered particularly dangerous either because of their position within drug circles or the leadership and organizing functions they perform. The statute therefore must be read to be confined to those offenders who can be said to exercise a governing or determining influence over narcotics violations.

The definitions of the words "organized" and "direct" provide further insight concerning the proof required to sustain a conviction for the offense of calculated criminal drug conspiracy. Black defines "organized" as follows:

"To establish or furnish with organs; to systematize; to put into working order; to arrange in order for the normal exercise of its appropriate functions." (Black's Law Dictionary 1251 (4th ed. 1951).)

"Direct" is defined as follows:

"To point to; guide; order; command; instruct. \* \* \* To assume the role of a director, one whose directions are binding." Black's Law Dictionary 546 (4th ed. 1951).

■■ In order to prove that the defendant either organized or directed a conspiracy to deliver a controlled substance there must be evidence which shows, in substance, that the defendant either had sufficient influence over his coconspirators to be in a position to systematize their

activities or to give orders or instructions that would to some extent be binding. Because we believe that the evidence in the case at bar does not meet this standard, we must reverse.

■■ The evidence does not show that defendant exercised a governing or determining influence in the transaction alleged. It does not show beyond a reasonable doubt that Jerry Lucas organized or directed the conspiracy. Instead the evidence shows only that the defendant participated in a conspiracy to deliver a controlled substance. But if the words "organized" and "directed" are to be given their plain and ordinary meaning, the evidence must establish more. The statute implicity requires that before a defendant can be convicted of the offense of calculated criminal drug conspiracy, the extent of his involvement must be measured against that of his coconspirators. In light of the evidence set forth above and the degree to which defendant participated in this transaction relative to the involvement of his coconspirators, we do not believe it can be said that Jerry Lucas either organized or directed the conspiracy to deliver cocaine. Under these circumstances we must reverse the conviction for calculated criminal drug conspiracy. Consequently, the conviction for delivery of a controlled substance is affirmed.

For the foregoing reasons, the judgment of the circuit court of Putnam County is reversed in part and affirmed in part.

Reversed in part, affirmed in part.

ALLOY and STENGEL, JJ., concur.