THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEVE SPAHR, Defendant-Appellant.

Fourth District    No. 14212

Opinion filed January 13, 1978.

Richard J. Wilson and Charles M. Schiedel, both of State Appellate Defender's Office, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (Robert C. Perry and Jeffrey B. Levens, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE REARDON delivered the opinion of the court:

A Sangamon County jury found the defendant guilty of delivering a substance which he represented to be the controlled substance methylenedioxyamphetamine (MDA) on February 23, 1976, in violation of section 404 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1975, ch. 56½, par. 1404). After entering judgment on the verdict and after conducting a sentencing hearing, the court sentenced the 17-year-old defendant to a 3-year term of probation with the first 60 days to be served in the county jail.

On appeal, defendant contends: (1) that he is not guilty of the offense of delivering a substance represented to be a controlled substance because he was a victim of entrapment; (2) that he was denied a fair trial by the admission of evidence of his prior arrest for marijuana possession and the exclusion of defense testimony tending to show an attempt to entrap defendant's brother; and (3) that defendant was prejudiced by the prosecutor's closing argument.

At defendant's trial, Illinois Bureau of Investigation Agent Lou Reilly testified that on January 7, 1976, she and an informer named James Brown went to the defendant's family residence to purchase some phencyclidine (PCP) or "dust." When they arrived at defendant's home, Reilly waited in the car while a young woman led Brown into the house. Reilly testified without objection by the defense that Brown returned to the car within three minutes, telling Reilly that defendant told him he had no PCP, but

that he knew where it was available. Thereafter, the defendant entered the car and the three drove to another address. When they arrived, defendant asked Reilly for $200 to purchase two grams of PCP. After Reilly handed him the money, defendant left the car, procuring the PCP which he turned over to Reilly.

When the defendant testified, he admitted participating in the transaction described by Reilly, but he claimed that he had been entrapped by Brown. Defendant stated that Brown gave him one gram of PCP while they were in the living room of defendant's home. At that time, Brown asked the defendant to divide the PCP into two parts in order to mislead and sell both to Reilly as a two-gram sale. After the sale was completed, defendant testified that he gave Brown $150, keeping $50 for himself.

On February 23, 1976, Reilly and Brown again went to defendant's family residence to purchase some MDA. The witnesses do not agree as to what transpired at that meeting. Reilly testified that Brown went to the door of the home, spoke with defendant's mother at the door and then motioned for Reilly to enter the home with him. Defendant's mother testified that Brown and Reilly did not enter the house for the first time together. She said Brown entered alone and then went downstairs to defendant's bedroom where he spoke with the defendant. Brown then returned upstairs, walked to the front door and motioned Reilly into the house. Reilly and Brown then went downstairs to defendant's bedroom. The defendant and Reilly both agree that defendant sold Reilly three grams of a substance represented to be "mad dog" (a slang term for MDA) at a total cost of $180.

Although defendant admitted participating in the February 23 transaction, he again claimed to have been entrapped by Brown. Defendant testified that on his first trip to the bedroom on February 23, Brown gave defendant a substance that Brown identified as a placebo or fake drug. Defendant stated that Brown wanted defendant to deliver the placebo to Reilly because Brown said that he again wanted to deceive Reilly since he owed money to Reilly and was afraid that if Brown personally delivered the placebo, he would have to satisfy the debt. For his participation in this transaction, defendant admitted earning $80.

Reilly testified that, after completing the transaction, the defendant asked her if he could have a ride to a friend's home. Defendant stated that he was anxious to leave because his mother was upset over defendant's January 7, 1976, arrest for possession of more than 100 grams of marijuana.

Brown did not testify at defendant's trial because he had been sent to Tucson, Arizona, on a trip that was apparently financed by the Illinois Bureau of Investigation. Approximately one week prior to defendant's

trial, Brown returned to Springfield and was interviewed by defendant's counsel. Brown, however, was not subpoenaed to appear for the trial and, at the time of trial, he had returned to Tucson.

Section 7—12 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 7—12) provides: "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated."

■■ In Illinois, the defense of entrapment is only available to a defendant who admits at trial that he committed the acts which constitute the crime for which he claims entrapment. (*People v. Fleming* (1971), 50 Ill. 2d 141, 144, 277 N.E.2d 872.) The question of whether entrapment exists is ordinarily reserved for the jury and should not be disturbed on appeal unless the reviewing court concludes that entrapment exists as a matter of law. *People v. Gulley* (1976), 36 Ill. App. 3d 577, 582, 344 N.E.2d 567.

■■ In *Gulley*, Mr. Justice Jones analyzed numerous State and Federal cases involving the defense of entrapment and concluded that Illinois courts, as well as a majority of the United States Supreme Court, have adopted a subjective test for entrapment. Under that test, there are two questions which must be answered when determining if entrapment is present: (1) whether the defendant was induced to commit a criminal offense by a government official or his agent; and (2) whether the defendant was predisposed to commit the type of offense with which he is charged. In order for entrapment to be present, the criminal conduct must be the product of the creative activity of a law enforcement official. This creative activity must be distinguished from those situations in which the government official permissibly provides only an opportunity for the commission of the crime by one who is already predisposed to its commission. *People v. Lewis* (1963), 26 Ill. 2d 542, 545-46, 187 N.E.2d 700, 701; accord, *Sherman v. United States* (1958), 356 U.S. 369, 372-73, 2 L. Ed. 2d 848, 851, 78 S. Ct. 819, 821.

Mr. Justice Jones further noted that another test for entrapment, the objective test, has been espoused by a minority of the United States Supreme Court. Under this objective test, the only factor which is considered is whether the governmental conduct falls below the standard by which governmental action should be measured. (*E.g., Sherman* (Frankfurter, J., concurring).) Our research has disclosed a more recently announced third test for entrapment which is authored by Mr. Justice Rehnquist. Under the Rehnquist standard, the existence of

governmental misconduct is irrelevant to the question of whether entrapment is present so long as it can be said that the defendant was predisposed to commit the offense. Justice Rehnquist would have us believe that fundamental fairness and the due process guarantee would never prevent a predisposed defendant's conviction, no matter how unconscionable is the police behavior in the overall context of the case. *Hampton v. United States* (1976), 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646, (3-2-3 plurality opinion of Rehnquist, J.).

■■ In Illinois, the opinions of any appellate court are binding on all of the State's circuit courts, but not on the other branches of the appellate court. (*People v. Hurlbert* (1976), 41 Ill. App. 3d 300, 302, 354 N.E.2d 652, 654-55.) Illinois supreme court decisions are binding on all Illinois courts (*Agricultural Transportation Association v. Carpentier* (1953), 2 Ill. 2d 19, 27, 116 N.E.2d 863), but decisions of Federal courts other than United States Supreme Court decisions concerning questions of Federal statutory and constitutional law are not binding on Illinois courts. (*People v. O'Neal* (1976), 40 Ill. App. 3d 448, 450, 352 N.E.2d 282, 283.) The decision of a State's highest court solely on a question of State law is not reviewable by the United States Supreme Court. Wright, Law of Federal Courts §107, at 481-92 (2d ed. 1970); James & Hazard, Civil Procedure §12.12, at 624 (2d ed. 1977).

In *Boyd v. United States* (1886), 116 U.S. 616, 635, 29 L. Ed. 746, 752, 6 S. Ct. 524, 535, a case that Mr. Justice Brandeis recognized as "a case that will be remembered as long as civil liberty lives in the United States," (*Olmstead v. United States* (1928), 277 U.S. 438, 471, 474, 72 L. Ed. 944, 953, 954, 48 S. Ct. 564, 570, 571 (Brandeis, J., dissenting)), the court announced that "* * * constitutional provisions for the security of person and property should be liberally construed * * *. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Mr. Justice Brennan has noted that some State courts have discerned, and disagreed with, a trend in recent Supreme Court opinions to pull back from the *Boyd* principle with respect to application of the Federal Bill of Rights and the restraints imposed by the due process and equal protection clauses of the fourteenth amendment. Mr. Justice Brennan has encouraged State courts to extend greater protections to their citizens via State constitutions than is extended by the Supreme Court via the Federal Constitution. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 495, 503 (1977); *cf. Ashe v. Swenson* (1970), 397 U.S. 436, 449-60, 25 L. Ed. 2d 469, 478-84, 90 S. Ct. 1189, ___ (Brennan, J., concurring by saying that Federal standards govern where State standards are less protective).

Our analysis of section 7—12 and the decisions interpreting that section causes us to disagree with the view expressed in the Supreme Court's plurality opinion in *Hampton.* Only Justices Rehnquist, White and the Chief Justice were able to agree with the standard announced for the first time in *Hampton* and only five of the eight sitting Justices were able to concur in the result. Because of that and because we find that our statute and court decisions offer more protection from entrapment than the Supreme Court decision, we distinguish *Hampton.*

The instant defendant testified that he was induced to deliver what was represented to be a controlled substance by the government informer, Brown, who allegedly supplied the purported drug to the defendant. Brown did not testify for the State at defendant's trial and even Reilly did not directly deny the defendant's statement that the purported drug was supplied by Brown. Clearly, a conviction for selling a controlled substance or a purported controlled substance cannot be sustained if the substance is supplied by the government. (*People v. Strong* (1961), 21 Ill. 2d 320, 325, 172 N.E.2d 765; *contra, United States v. Russell* (1973), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637; *Hampton.*) If the State fails to call an informer to rebut testimony that the informer supplied drugs to the defendant, then the conviction should be reversed. *People v. Dollen* (1972), 53 Ill. 2d 280, 284-85, 290 N.E.2d 879; *cf. People v. Jones* (1966), 73 Ill. App. 2d 55, 219 N.E.2d 12.

■■ We are aware of the severe societal problem caused by the use and transfer of controlled substances; however, we cannot condone governmental conduct that falls below the standard set by our laws and constitution. In his dissenting opinion in *Olmstead,* Mr. Justice Brandeis very effectively stated: "In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent, teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means— to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." (277 U.S. 438, 485, 72 L. Ed. 944, 960, 48 S. Ct. 564, 575.) In the instant case, the defendant's testimony, standing alone, does not demonstrate that the government has violated the law; however, that burden has not been placed on the defendant. It is clear that defendant's testimony, coupled with the State's failure to provide the testimony of the informer, Brown, creates a reasonable doubt as to defendant's guilt.

Owing to the fact that we have found the first issue to be dispositive of this appeal, we decline to address the remaining questions presented by the defendant.

For the foregoing reasons, we reverse defendant's conviction for delivering a substance represented to be controlled.

Reversed.

CRAVEN and MILLS, JJ., concur.