THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RICHARD SIMON, Defendant-Appellant.

First District (5th Division)    Nos. 79-2468, 80-274 cons.

Opinion filed October 16, 1981.

Robert H. Aronson, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Lawrence Krulewich, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant was charged by indictments with three counts of delivery of cocaine (Ill. Rev. Stat. 1979, ch. 56½, pars. 1401(a)(2), 1401(b)), two counts of conspiracy to deliver cocaine (Ill. Rev. Stat. 1979, ch. 38, par. 8—2), and two counts of calculated criminal drug conspiracy (Ill. Rev. Stat. 1979, ch. 56½, par. 1405). A jury found defendant guilty of each charge and judgment was entered. The trial court, finding the simple conspiracies and the deliveries merged into the greater calculated criminal drug conspiracies, sentenced defendant to concurrent seven-year terms for the two calculated criminal drug conspiracies. Defendant appeals. We affirm in part, reverse in part, and remand for sentencing.

Defendant raises the following issues on appeal: (1) whether the amendment of his indictments shortly before trial was improper; (2) whether certain evidence taken incident to his warrantless arrest should have been suppressed; (3) whether entrapment had been proved as a matter of law; (4) whether the State proved that the substance delivered was cocaine; (5) whether the court erred in denying his motion for a mistrial; (6) whether he was proved guilty beyond a reasonable doubt of calculated criminal drug conspiracy; (7) whether the Class X felony of calculated criminal drug conspiracy is unconstitutional as applied to him; and (8) whether certain closing remarks of the prosecutor resulted in prejudicial error.

The following evidence was adduced at trial. Additional facts necessary to the resolution of the issues raised will be discussed as needed. In late 1977 a man named Dane Roth contacted the defendant and asked his help to obtain cocaine. Defendant was unable to obtain any cocaine for Roth until May 19, 1978. On that date Roth, accompanied by Judith Jankovich and Al Rodriguez, two special agents employed by the Illinois Department of Law Enforcement, went to defendant's residence. There an individual named Angelopoulos, who supplied defendant with cocaine for the latter's personal use, sold some cocaine to the agents. Dane Roth was subsequently arrested for assisting in this sale and, as a result, became an informant.

On June 15, 1978, Roth, now an informant, and Agent Jankovich again met with defendant. Jankovich inquired about purchasing a pound of cocaine. Defendant stated he would check with his people and see what he could do.

The next day Jankovich and Roth met with defendant at the latter's residence. Defendant testified that Roth pulled him aside and pleaded with him to get the cocaine Jankovich wanted. Jankovich testified that before she and Roth left, defendant uncapped a bottle containing white powder and offered her some to snort. Jankovich refused, but defendant snorted a "line" of cocaine. Jankovich also testified that when she returned to defendant's apartment later that same day, defendant identified another individual, Meryl Saxe, as his source of "good coke." Meryl Saxe and defendant had been friends from childhood.

Defendant testified that a few days later Roth called him, told him he had been busted and that defendant would be arrested if he didn't cooperate. Jankovich testified that she never told defendant she was a police agent. Defendant testified from this point on he thought he was helping Jankovich. Neither defendant nor Jankovich testified that defendant ever mentioned to her he knew she was an agent.

Subsequently, defendant made two calls to Jankovich to arrange the sale of an ounce of cocaine to her. That sale was consummated on July 12,

1978, at the home of Meryl Saxe, where defendant had directed Jankovich. Two others, Albert Greenberg and Harold Siegel, were also present. Siegel produced some white powder. Defendant snorted some and pronounced it good. Jankovich gave Siegel $2250 for the cocaine and told him that she was interested in purchasing larger quantities. Siegel quoted her an $8000 price for four ounces. Jankovich and defendant left. Before driving away, Jankovich gave defendant two marked $50 bills.

On July 13, 1978, defendant called Jankovich, at which time she complained that the $8000 price was too high. Defendant called her back and quoted her a lesser price. She also asked him the prices of a pound and of a kilo of cocaine. He called her back later and quoted her prices of $25,000-$27,000 and $50,000, respectively. Arrangements were made for Jankovich to purchase four ounces of cocaine. The sale occurred at Meryl Saxe's apartment later that evening. Defendant, Saxe, Siegel and Agents Jankovich and Gomilla were present. Jankovich paid Siegel for the cocaine and, after leaving the apartment, Jankovich paid $250 to defendant.

On July 19, 1978, a meeting took place to discuss the possible sale of a pound of cocaine to Jankovich. In attendance were Siegel, Saxe, Greenberg, Jankovich and defendant. During the discussion Siegel turned to defendant and told him that if Jankovich was "the man you're dead." Defendant gave Jankovich Saxe's telephone number so that she might contact him personally.

Between June 20 and 22, 1978, Jankovich talked with Saxe to arrange for the purchase of a pound of cocaine. On July 23, 1978, Jankovich told defendant that she would like the sale to occur at a place of her designation. Defendant told her to speak to Saxe about the matter. Jankovich called him and Saxe told her that the sale would occur at defendant's home that evening. The price for the pound of cocaine was $26,000.

A few hours later Jankovich and Gomilla went to defendant's home where defendant, Saxe, Siegel and Greenberg were waiting. Defendant told Greenberg and Saxe to produce "the package," Greenberg handed a grey paper bag to Jankovich, who removed a plastic bag and gave it to Gomilla. Gomilla tested the contents of the plastic bag and determined it was possibly cocaine. Defendant then weighed the plastic bag and its contents. Gomilla went outside to get the money to purchase the cocaine. Upon returning, he gave the money to Greenberg who along with Siegel counted it. There was $26,000 in five $5000 bills and one $1000 bill.

After the sale was completed, Jankovich and Gomilla left defendant's home. When completely outside, Gomilla gave a prearranged arrest signal to other agents who were waiting outside. Four of those agents approached the front door of defendant's residence. They knocked and

announced their office several times. When no one opened the door, they smashed into it with a battering ram. When the door would not give in, the battering ram was thrown through the front window. One agent entered the residence through the window. Upon entering, he saw defendant approaching the front door, whereupon he arrested him and ordered him to open the front door. Saxe, Siegel and Greenberg were also arrested. Incident to the arrest, $20,000 was taken from Siegel, $6,000 was taken from Greenberg, and $81 was taken from defendant. A loaded gun which had been in Greenberg's possession was also taken into evidence by the agents. The arrests and accompanying search and seizure were made by the agents without either an arrest or search warrant.

OPINION

Defendant first asserts that the trial court erred when it allowed the People to amend the indictments of defendant for the offense of calculated criminal drug conspiracy shortly before trial.

The original indictments recited in pertinent part that " * * * Richard Simon * * * organized and directed said conspiracy in violation of Chapter 56-½, Section 1405, Illinois Revised Statutes 1977, as amended * * *." Upon the People's motion, the word "directed" was deleted from the calculated criminal conspiracy drug counts. Defendant asserts that this alteration was material, lessening the prosecution's burden of proof and causing substantial prejudice to him. The People counter that the word "directed" was mere surplusage and properly deleted.

An indictment may be amended on motion of the State's Attorney or defendant at any time because of formal defects (Ill. Rev. Stat. 1979, ch. 38, par. 111—5), including "[t]he presence of any unnecessary allegation." Ill. Rev. Stat. 1979, ch. 38, par. 111—5(d).

The primary safeguard of indictment by grand jury, which remains secured to criminal defendants, is to protect individuals from the caprice of the public prosecutor. (*People v. Jones* (1973), 53 Ill. 2d 460, 292 N.E.2d 361.) Hence, where no hint of surprise or prejudice is shown, the allowance of an amendment is not error. 53 Ill. 2d 460, 465, 292 N.E.2d 361, 363.

Defendant cites *People v. Betts* (1979), 78 Ill. App. 3d 200, 397 N.E.2d 106, for support that the amendment in the instant case was substantive and not merely formal. In *Betts*, the court stated that an amendment is no longer technical where it seeks to change the very offense with which the defendant is charged. 78 Ill. App. 3d 200, 202, 397 N.E.2d 106, 108.

■■ Here, defendant was charged with calculated criminal drug conspiracy. (Ill. Rev. Stat. 1979, ch. 56½, par. 1405.) An essential element of that crime is that the defendant alternatively either organize, or finance,

or direct, or obtain $500 from the conspiracy. (Ill. Rev. Stat. 1979, ch. 56½, par. 1405(b)(3); *People v. Biers* (1976), 41 Ill. App. 3d 576, 353 N.E.2d 389.) In the instant case the deletion of the word "directed" merely removed an alternative element but did not alter the crime charged. Hence, the amendment neither surprised nor prejudiced defendant and, accordingly, was proper.

Defendant next asserts that the trial court erred in denying his motion to suppress certain evidence taken by agents incident to their forced entry into his home and his subsequent warrantless arrest there.

Preliminarily, we note, however, that framing the issue in this manner does not accurately reflect the facts of this case. Agents Jankovich and Gomilla initially entered defendant's home as invitees of defendant, pursuant to his consent. While thus validly within his home, they witnessed the commission of a felony in their presence. They withdrew from defendant's home and re-entered moments later with fellow agents to effect the arrest of defendant and his associates.

Jankovich and Gomilla, having witnessed the commission of a felony in their presence, could have effected defendant's arrest upon their first consensual entry into his home (Ill. Rev. Stat. 1979, ch. 38, par. 107—2(c); *People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608) even though such entry had been gained by ruse. (See *Lewis v. United States* (1966), 385 U.S. 206, 17 L. Ed. 2d 312, 87 S. Ct. 424, *rehearing denied* (1966), 386 U.S. 939, 17 L. Ed. 2d 811, 87 S. Ct. 951.) They did not do so, however, but rather arrested defendant upon their nonconsensual re-entry into his home.

■■ Absent exigent circumstances, a warrantless and nonconsensual entry into a suspect's home to effect a routine felony arrest has been held impermissible by the supreme courts of both the United States and Illinois. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) Therefore, the issue for determination here is whether under the facts of this case the momentary withdrawal from defendant's home and subsequent re-entry to effect his arrest and the arrest of his associates were justified by exigent circumstances. We believe such circumstances were present.

At the point in time prior to exiting defendant's home when Jankovich and Gomilla could first have arrested defendant and his colleagues, they were outnumbered; at least one of the prospective arrestees was armed and at least two were believed to be heavy drug dealers and dangerous. Under these circumstances we do not consider this arrest routine nor the agents' action in withdrawing to obtain assistance to effect the arrests in question unreasonable, particularly when we consider the guidelines laid

down by the Illinois Supreme Court in *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543, to determine whether exigent circumstances existed there to justify a warrantless arrest: (1) the immediacy with which the officers proceeded to the defendant's residence upon learning of his identity; (2) the fact that there was no deliberate or unjustified delay by the officers during which time a warrant could have been obtained; and (3) the belief that the arrestee was armed and exhibited some sign of a violent character. Additionally, the court noted that the officers in *Abney* were acting upon a clear showing of probable cause; the arrestee had been clearly identified; the officer had strong reason to believe that the arrestee was in the premises entered; and finally, that the entry was peaceful.

Although the re-entry in the instant case was certainly not peaceful, we are unable to say on this record that the force utilized was unreasonable, and hence we believe on balance that the factors cited in *Abney* were established. *People v. Thompson* (1981), 93 Ill. App. 3d 995, 418 N.E.2d 112.

Defendant next asserts that the trial court should have granted defendant's motion for a directed finding at the close of all the evidence because entrapment had been proved as a matter of law.

■■ Defendant's position is predicated on the following argument. Subsequent to the presentation of the State's case, defendant testified in his own behalf. He stated that on or about June 18, 1978, Dane Roth, a police informant, telephoned him and told him that he had been busted by Jankovich, a police agent. Roth allegedly also told defendant that he, too, would be arrested unless he cooperated with her. From that point on, defendant testified, he believed he was only assisting Jankovich, so as to avoid his own arrest. The State did not call Dane Roth to rebut defendant's testimony. Defendant asserts that the failure of the prosecution to call Roth in rebuttal established entrapment as a matter of law, relying on *People v. Spahr* (1978), 56 Ill. App. 3d 434, 371 N.E.2d 1261. However, we find the Illinois Supreme Court case of *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812, *cert. denied sub nom. Thomas v. Illinois* (1980), 445 U.S. 929, 63 L. Ed. 2d 762, 100 S. Ct. 1316, to be dispositive of this issue. There the court rejected a *per se* rule that a conviction for the unlawful sale of narcotics could not stand when a police informer supplied the drugs. (77 Ill. 2d 396, 404, 396 N.E.2d 812, 816.) The court also stated that the failure of the State in that case to call the informant to rebut the defendant's testimony that the informant supplied the drugs only created an inference against the State. (77 Ill. 2d 396, 406, 396 N.E.2d 812, 817.) Thus, while in this case, as in *Cross*, the failure of the State to call the police informant to rebut defendant's testimony may have

given rise to an inference against the State, it did not establish entrapment as a matter of law. Therefore, the issue of entrapment remained a question of fact to be determined by the jury. (*People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528.) Accordingly, the trial court properly denied defendant's motion for a directed finding at the close of all the evidence that entrapment had been established as a matter of law.

Defendant next asserts that reversal of his conviction is required because the State failed to prove beyond a reasonable doubt that the substance delivered to Jankovich was cocaine as defined in the Controlled Substances Act.

Two forensic scientists testified on behalf of the prosecution as to the various methods which they employed to test the substance they had received from Jankovich. They testified that after using the thin layer chromatography test, the mass spectronomy test and the infrared spectrometer test, they were able to conclude that the substance they tested was cocaine.

The defendant called Dr. Robert Shapiro, a university chemistry professor, to testify on his behalf. Dr. Shapiro stated that in his opinion the only test to distinguish between the stereoisomers of cocaine which had been demonstrated in scientific literature was the nuclear magnetic residence spectometry test, which was not used in the instant case. On cross-examination Dr. Shapiro stated that he was unfamiliar with certain comparative tests utilized by the prosecution's expert witnesses in identifying the substance in question as cocaine and that he never in fact tested the substances delivered to Jankovich and analyzed by the prosecution's witnesses.

■■ In view of the expert testimony in this case, the essence of defendant's argument is that the State failed to prove beyond a reasonable doubt the substance in question was cocaine because the testimony of the expert witnesses for the prosecution and for the defense conflicted with regard to the tests necessary to determine if the substance in question was cocaine. We find no merit in this contention. To the extent that evidence is conflicting, it is the province of the trier of fact to resolve the conflict and decide which witness or witnesses will be believed. (*People v. Smith* (1980), 81 Ill. App. 3d 764, 401 N.E.2d 1017.) Any conflict in the testimony between the expert witnesses in this case was resolved by the jury, and we find no reason to disturb that determination.

Defendant next asserts that the court erred in denying his motion for a mistrial based upon a question posed by the prosecution to defendant's expert during cross-examination. However, we consider this issue to be waived as defendant failed to raise this alleged error in his written post trial motion for a new trial. The general rule is that the failure by the defendant to raise an issue in a written motion for a new trial constitutes a

waiver of that issue and it cannot be urged as a ground for reversal on review. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

Defendant also contends that the People failed to prove beyond a reasonable doubt that he organized a calculated criminal conspiracy, relying on *People v. Lucas* (1975), 33 Ill. App. 3d 309, 337 N.E.2d 103. In *Lucas*, the court stated that in order to prove that a defendant either organized or directed a conspiracy to deliver a controlled substance, there must be evidence which shows in substance that the defendant either had sufficient influence over his co-conspirators to be in a position to systematize their activities or to give orders or instructions that would to some extent be binding. 33 Ill. App. 3d 309, 314, 337 N.E.2d 103, 107.

Defendant was convicted and sentenced for organizing two criminal drug conspiracies, one from July 12-13 and another from July 19-23. However, defendant asserts in his brief that the record shows that he did not exercise any influence in the three sales to Jankovich and that he did not organize anything.

Both Jankovich and defendant testified as to the events which occurred on July 12 and 13 and from July 19-23.

Jankovich testified that defendant called her at the MEG office on July 12, 1978, at 7 p.m. and told her that his people had one ounce of cocaine to sell and that he would pick it up and return to his home. He told her the price would be $2250 and that he wanted to be taken care of for setting up the deal—explaining that he wanted part of the cocaine. Jankovich said she couldn't give him cocaine but she would give him money.

Jankovich went to defendant's house about 11 p.m. After her arrival defendant made a telephone call, hung up, and after telling her that he was leaving to get the "dope," left the house. Later defendant telephoned his home and gave Jankovich directions to his location. Jankovich followed his directions to an apartment complex where she looked for an apartment with a flashing light. After locating it, she knocked on the door and Meryl Saxe opened it. Hal Siegel and Al Greenberg were also present in addition to Saxe and defendant. Siegel produced the cocaine; Greenberg said he had weighed it and that it was of excellent quality. Defendant provided a rolled bill and he, Greenberg and Siegel each snorted a line of cocaine. Defendant told Jankovich the cocaine was good. Jankovich took $2250 from her purse and gave it to Siegel. She told Siegel she wanted larger quantities. Siegel responded that a sale of four ounces would have to go first. Jankovich assured him she could move it safely. Siegel and Greenberg agreed that moving it safely was most important. Jankovich asked Siegel the price for four ounces and Siegel responded that it would cost $8000—assuring her the larger the quantities the cheaper the price. Jankovich stated she would let him know. Defendant stated he

would call her the next day, July 13, at approximately 2 p.m. Jankovich left with defendant who said he wished to walk her out to her car. Outside Jankovich gave him $100. Defendant returned to the apartment.

On the following day, July 13, defendant called Jankovich at approximately 6 p.m. Jankovich, complaining of the quality, told him her people would not pay $8000 for four ounces. Defendant said he would check with his people. Defendant called back at 7 p.m. and said his people would sell her four ounces for $7750. She again complained of the price. He responded that the more business she would do the cheaper the price. They hung up. Jankovich called defendant back. She asked how much a pound and a kilo of cocaine would cost. Defendant called her back quoting her a price of $25,000-27,000 for a pound and $50,000 for a kilo and stating that she could have it within two or three days. They hung up. Jankovich called him back and told him the pound and kilo prices were very good and that she would buy the four ounces. Defendant told her to go to his house about 10 p.m. that evening.

That night Jankovich accompanied by Gomilla went to defendant's house. However, only Jankovich went inside. After Jankovich's arrival, defendant made a telephone call to report her presence. Defendant and Jankovich went outside to where Gomilla was waiting. Jankovich took the money from Gomilla and had defendant count it. Defendant, after telling Gomilla and Jankovich to follow him in their car, directed them to Meryl Saxe's residence. Saxe met them outside of his apartment and escorted defendant and Jankovich inside. Greenberg and Siegel were also present in Saxe's apartment.

Siegel pulled out a clear plastic bag and said he only had 3½ ounces to sell. Defendant was to have called him by 2 p.m. to let him know if Jankovich wanted the four ounces, but he failed to call in time. Therefore, Siegel sold one-half ounce to another customer.

Defendant weighed the package and divided a small amount into four lines. He snorted a line and pronounced it good. Defendant and Jankovich went outside to get the money. Upon their return, Jankovich asked Siegel how much he wanted for the 3½ ounces, and he replied $6750. Jankovich gave him $7750, and Siegel counted out the proper amount. Jankovich put the cocaine in her purse. Siegel said he had no intention of handling a kilo of cocaine. Jankovich told Siegel they would discuss it later and defendant told them he would call them Monday morning. Defendant and Jankovich left the apartment. Defendant commented to her while outside that they were going to make a lot of money. Jankovich asked defendant how much he wanted. He said $250, to which she agreed. After giving him the money, she left the parking lot.

Defendant also testified as to the events of July 12 and 13. He stated

that he called Jankovich and told her that he was able to get something for her. Meryl Saxe had told him that he could get an ounce of $2250. Defendant relayed this information to Jankovich. Jankovich went over to defendant's house on the evening of July 12. She was to give defendant the money. He would then take it to Saxe's and exchange it for the ounce. Upon arriving at defendant's house, however, Jankovich wouldn't part with the money. Defendant then went to Saxe's, called her, and gave her directions there. The sale was completed at Saxe's. Jankovich gave Siegel the money and he gave her the cocaine. Defendant stated he snorted a line of cocaine in Jankovich's presence. Siegel, Saxe, Greenberg and Jankovich discussed larger sales of cocaine but defendant did not participate in this discussion. He had no idea where to obtain larger quantities. Defendant left with Jankovich. She gave him $100 for which he had not asked, although he admitted to asking for some cocaine.

On July 13, several calls were made between Jankovich and defendant. Jankovich had complained that the price was too high. The price negotiations had to be cleared through Saxe, whom defendant called. Jankovich went to defendant's home that evening. Defendant directed her and another man whom she identified as her bodyguard to Saxe's. A sale of 3½ ounces occurred there. Siegel told Jankovich that he had already sold one-half ounce. Jankovich gave the money to Siegel who in turn gave the cocaine to her. Defendant also snorted cocaine at this time. Further discussions were held as to sales of larger quantities but defendant did not take part. After defendant and Jankovich left the apartment, Jankovich gave him $250 for which he had not asked.

From the foregoing the jury could well have found defendant, Saxe, Greenberg and Siegel were co-conspirators in a plan to sell and deliver more than 30 grams of cocaine on July 13. Defendant could have been reasonably deemed by the jury as one of the organizers of the transaction. He had established contact between Saxe, one of his sources, and Jankovich. He communicated the time and place of the sale to her. He discussed prices with her and asked to be paid in cocaine for his services. Furthermore, Siegel's statement that he only had 3½ rather than four ounces to sell because defendant had not called him by 2 p.m. indicates the reliance that was placed upon defendant to set up the transaction.

■■ It is the function of a reviewing court to carefully examine the evidence in a criminal case giving due consideration to the fact that the court and jury saw and heard the witnesses. (*People v. Jefferson* (1962), 24 Ill. 2d 398, 182 N.E.2d 1; *People v. Howard* (1979), 74 Ill. App. 3d 870, 393 N.E.2d 1084.) Having reviewed this record, we conclude that defendant was proved guilty beyond a reasonable doubt of calculated criminal drug conspiracy for July 12-13.

We now consider whether the People proved defendant guilty beyond a reasonable doubt of calculated criminal drug conspiracy from July 19-23.

Jankovich testified that on the morning of July 19 she called defendant. He advised her that his people wanted to meet with her that evening at Saxe's to discuss the upcoming transaction. She complained of the location but defendant said that it was too late to make other arrangements.

That evening Jankovich and Gomilla again went to defendant's home. Gomilla and Jankovich then followed defendant in their car to Saxe's. Jankovich discussed with Greenberg and Siegel the possibility of acquiring a kilo. They declined but said they could provide all of the pounds she wanted. Jankovich then stated she wanted the transaction to occur at her house. The parties agreed to discuss the location later.

Jankovich further related that Siegel threatened defendant whereupon the latter gave her Saxe's number and advised her that she could contact Saxe regarding the upcoming transaction. Jankovich left shortly thereafter. Jankovich called Saxe on July 20, 21 and 22 to see if the pound of cocaine had been obtained. She did not call defendant on those dates. On July 23 she spoke with Saxe again and he informed her that they would be ready to transact the deal that evening. About 4:30 p.m. Jankovich called Saxe to learn the price. He said the price was set at $26,000.

At approximately 7:45 p.m. defendant called Jankovich and told her that the deal was set to go that evening at his house. Jankovich called Saxe to have the location changed. Saxe refused. Later Jankovich and Gomilla proceeded to defendant's residence. Defendant told Greenberg and Saxe to show the package. Saxe then produced a grey paper bag. Gomilla tested a small quantity of the cocaine. Defendant then weighed the cocaine. Gomilla exited momentarily to retrieve the briefcase in which the money was kept. Upon his return he gave the money to Greenberg who along with Siegel counted it. Jankovich then took the cocaine and exited with Gomilla. Defendant's testimony as to these events substantially corroborated that of Jankovich.

■■ ■ This evidence demonstrates that defendant's participation in the events from July 19-23 was limited to directing Jankovich and Gomilla to Saxe's apartment on one occasion, informing her of the location of the transaction, allowing his home to be used as the site of the transaction and weighing the cocaine. There is no evidence that defendant exercised sufficient influence over his co-conspirators to systematize their activities. (*People v. Lucas* (1975), 33 Ill. App. 3d 309, 337 N.E.2d 103.) To the contrary the evidence shows that from July 20-23 Jankovich contacted Saxe directly to determine the amount to be sold, its price, as well as the

location of the transaction. If after carefully reviewing the evidence it is the opinion of the reviewing court that the evidence is not sufficient to establish defendant's guilt beyond a reasonable doubt, the conviction must be reversed. (*People v. Jefferson* (1962), 24 Ill. 2d 398, 182 N.E.2d 1.) In light of the evidence set forth and the degree to which defendant participated in this transaction relative to the involvement of his co-conspirators (*People v. Lucas*), we do not believe that the evidence supported a finding beyond a reasonable doubt that defendant organized the conspiracy from July 19-23 with which he was charged, and we, therefore, reverse his conviction of that charge. However, this evidence is sufficient to support the jury's verdict that defendant was guilty beyond a reasonable doubt of the July 19-23 simple conspiracy and the July 23 delivery. The trial court, because of a finding that the simple conspiracy and the delivery merged into the calculated criminal drug conspiracy, did not sentence defendant for that simple conspiracy or the delivery. Having reversed the July 19-23 calculated criminal drug conspiracy into which the simple conspiracy and the delivery "merged," that merger now fails. Therefore, judgment and sentence should be entered on either the July 19-23 simple conspiracy charge or the July 23 delivery charge of which defendant was also found guilty. See *People v. Zazzetti* (1979), 69 Ill. App. 3d 588, 388 N.E.2d 82; Ill. Rev. Stat. 1979, ch. 38, par. 8—5.

Defendant would next have this court declare the Class X felony of calculated criminal drug conspiracy unconstitutional as applied to him on the facts of this case. Because this offense has been characterized by the legislature as a Class X felony (Ill. Rev. Stat. 1979, ch. 56½, par. 1405(a)), the trial court could not consider defendant for probation. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3(c)(2)(C).) Defendant argues that as he was entrapped and only on the periphery of the criminal transaction, he would have made a good candidate for probation. Defendant reasons that by forbidding the judge from considering probation in his case, the Class X felony of calculated criminal drug conspiracy violated article I, section 11 of the Illinois Constitution which provides in pertinent part that:

"All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

■■ Defendant's argument is without merit, however, because it rests on a premise that the jury rejected—that defendant was entrapped and only peripherally involved in those crimes charged. These matters bore directly on the issue of defendant's guilt or innocence and were for the jury to determine. As we have already concluded defendant was proved guilty beyond a reasonable doubt of calculated criminal drug conspiracy from July 12-13, conspiracy to deliver from July 19-23, and delivery on July 23, defendant's argument must of necessity fail.

It is defendant's final contention that certain remarks of the prosecutors during closing argument were improper resulting in prejudicial error. However, only one of the allegedly prejudicial comments was objected to during trial. Those not objected to were, therefore, waived. *People v. Daniels* (1979), 76 Ill. App. 3d 646, 395 N.E.2d 163.

The following prosecutorial remark was objected to at trial:

"But Mr. Simon tells you that on—a couple of days after June 16, he [Dane Roth] called me franticly [*sic*] and said, I have been busted. You got to help me.

Well, use your common sense, because the evidence that we have presented and his statements don't support that that was ever said. What the evidence and his statement do support is that that is a lie."

It is clear that a prosecutor in closing argument may argue that a witness' testimony is false, if in so doing he relies on the evidence and the inferences from it to support his conclusion. (*People v. Sinclair* (1963), 27 Ill. 2d 505, 190 N.E.2d 298; *People v. Hine* (1980), 88 Ill. App. 3d 671, 410 N.E.2d 1017.) Each case, of course, must be decided on its own facts. *People v. Daniels* (1979), 76 Ill. App. 3d 646, 395 N.E.2d 163.

■■ A review of the record indicates that sufficient evidence was presented of actions taken and statements made by the defendant which were inconsistent with knowledge that Jankovich was a police agent. Thus, the prosecutor's statement was not without evidentiary support and hence was proper.

Based on the following, we reverse defendant's conviction for calculated criminal drug conspiracy July 19-23; we affirm defendant's conviction for calculated criminal drug conspiracy July 12-13; and we remand the convictions for the July 19-23 simple conspiracy and the July 23 delivery for sentencing consistent with this opinion and section 8—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 8—5).

Reversed in part; affirmed in part; remanded for sentence.

SULLIVAN, P. J., and LORENZ, J., concur.