2021 IL App (1st) 191143-U

SIXTH DIVISION
March 19, 2021

No. 1-19-1143

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 15 CR 3972 |
| NATHAN NISSENBAUM, | ) ) | Honorable Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1   *Held*:   Defendant failed to demonstrate that he received ineffective assistance during plea negotiations where he failed to establish a reasonable probability that, but for his attorney's allegedly deficient performance, he would have accepted a plea offer by the State.

¶ 2   Defendant Nathan Nissenbaum was charged with, among other things, home invasion, aggravated kidnapping, aggravated criminal sexual assault, and aggravated domestic battery, following an incident with his ex-girlfriend, D.K. During pretrial proceedings, Mr. Nissenbaum's attorney received a text message from the State initiating plea negotiations. This text forms the

predicate for Mr. Nissenbaum's claim of ineffective assistance. No plea agreement was reached, and Mr. Nissenbaum was found guilty by the court in a bench trial. After the trial, Mr. Nissenbaum filed a posttrial motion making the same ineffective assistance claim that he makes on appeal. Following briefing and an evidentiary hearing, the trial court denied Mr. Nissenbaum's motion and sentenced him to 14 years in prison.

¶ 3    For the following reasons, we affirm the judgment of the trial court.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. Trial

¶ 6    Mr. Nissenbaum was indicted on March 19, 2015, and his case proceeded to trial on June 13, 2017. Mr. Nissenbaum was tried on seven counts: two counts of aggravated criminal sexual assault, two counts of aggravated kidnapping, and one count each of home invasion, aggravated domestic battery, and attempted aggravated arson.

¶ 7    D.K. testified for the State that she dated Mr. Nissenbaum from December 2013 to the end of November 2014. She was granted an emergency order of protection against Mr. Nissenbaum on January 9, 2015, and a mutual no contact order was entered on January 30, 2015. On February 11, 2015, D.K., who was self-employed as an escort and managed her bookings online, received a new client request. The request was from Mr. Nissenbaum but he used a false name. Not knowing it was Mr. Nissenbaum, D.K. set up an appointment for the following morning.

¶ 8    On February 12, 2015, Mr. Nissenbaum arrived wearing a disguise. D.K. testified that he forced her to the bed and handcuffed her. She said she realized it was Mr. Nissenbaum when his sunglasses fell off. Mr. Nissenbaum put a gun to her head and threated to kill her if she did not stop struggling. She testified that he duct-taped her wrists around the handcuffs as well as her ankles, thighs, and mouth. She testified that he then hit her face and body with his hands, choked

her, and raped her. Mr. Nissenbaum removed the duct tape after he raped her and then announced that he was going to commit suicide. He took razor blades he had brought with him into the bathtub and cut his arms. D.K. ran outside and called the police, who arrived shortly after. She was then taken to the hospital. The police arrested Mr. Nissenbaum and hospitalized him as well.

¶ 9       D.K. acknowledged during her testimony that when she and Mr. Nissenbaum were dating, they had sexual encounters where she consented to Mr. Nissenbaum slapping her in the face and body, pulling her hair, and being physically held down. She testified that she "acted as a submissive" and Mr. Nissenbaum "acted as the domina[nt]." She explained that, generally, Mr. Nissenbaum "would engage most of our sexual encounters, and he would come up with ideas of what we were going to do, and *** [she] would directly or indirectly agree to most of them[,] *** [b]ut he was mostly in control of them." She testified that they negotiated and engaged in consensual "rape fantasies" and that she would have bruises following these sexual encounters.

¶ 10      The parties stipulated that Patience Lesueur, a nurse who examined D.K. at the hospital after the encounter on February 12, 2015, would testify that there were "scuff marks to [D.K.]'s forehead, right wrist, left wrist, right shin, and left shin" and that D.K. "had swollen lips and a handprint [on] her left lower back." Ms. Lesueur administered a sexual assault kit. The parties also stipulated that the DNA recovered from the kit matched Mr. Nissenbaum's DNA.

¶ 11      Chicago police officer Ivan Feliciano testified that he was called to D.K.'s apartment shortly after 2 p.m. on February 12, 2015. He and his partner, Officer Reyes, entered D.K.'s apartment and found Mr. Nissenbaum shirtless in the bathtub with blood on his arms. There was also a small fire in the bathroom. Officer Feliciano testified that he rode with Mr. Nissenbaum in an ambulance to the hospital and that, during the ride, Mr. Nissenbaum said "it didn't go as planned" and that D.K. "was a prostitute and he pos[]ed as a john in order to gain entry—to get

3

in." Chicago police detective Mark Dimeo testified that the gun recovered from D.K.'s apartment, which was the gun that D.K. testified Mr. Nissenbaum had held to her head, was a BB gun.

¶ 12    Mr. Nissenbaum testified in his own defense. He confirmed that he booked the appointment with D.K. under a false name and arrived at D.K.'s apartment in a disguise. However, he testified that she consented to being restrained and to having sex with him. Mr. Nissenbaum testified that he showed D.K. the BB gun, but he did not hold it against her head. He also explained that he knocked over a candle after cutting himself, and that was what started the small fire in the bathroom.

¶ 13    Mr. Nissenbaum explained in some detail various consensual encounters between himself and D.K. that occurred while they were dating. Mr. Nissenbaum described these encounters as "rape play" and stated that he would, either with her consent or by her request, pull her hair, verbally abuse her, and engage in "rough sex." He testified to a specific occasion where, at D.K.'s request, he handcuffed her, gagged her, tied her legs together, and then beat her body with a cane and other objects. She also requested that he "surprise her" with a "violent rape sort of situation, when she wasn't expecting it," which he testified he that he agreed to and that he snuck up on her in the garage after she returned home one day. He explained that they had a safe word they would use when the other person needed to stop an act and that she did not use the safe word during the "rape fantasies" he detailed in court or during the February 12, 2015, encounter resulting in his charges. According to Mr. Nissenbaum, D.K. sometimes had bruises and marks on her body following those consensual interactions.

¶ 14    On September 15, 2017, the court found Mr. Nissenbaum guilty of aggravated criminal sexual assault, home invasion, aggravated kidnapping, and aggravated domestic battery.

¶ 15                                    B. Posttrial

¶ 16    On October 13, 2017, Mr. Nissenbaum timely filed a motion for a new trial and a motion in arrest of judgment. His pretrial and trial counsel, Michelle Truesdale, withdrew from representation that same day, and two new attorneys filed appearances on his behalf. On February 28, 2018, Mr. Nissenbaum filed a supplemental posttrial motion adding an argument that Ms. Truesdale had provided him with ineffective assistance of counsel during the plea negotiation process. Specifically, Mr. Nissenbaum alleged that Ms. Truesdale failed to inform him that if he were convicted of criminal sexual assault and another Class X offense, he would face mandatory consecutive sentencing under section 5-8-4 of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(2) (West 2014)) and a minimum of 12 years in prison. He further alleged that she did not provide him with a realistic appraisal of the likely outcome of his trial. He stated that, had Ms. Truesdale not performed deficiently in this manner, he would have accepted the State's plea deal and received a significantly lighter sentence.

¶ 17    The matter was fully briefed by the parties, and the court held an evidentiary hearing over the course of three days: September 21, 2018, February 22, 2019, and March 28, 2019. Assistant State's Attorney (ASA) Jennifer Bagby, Mr. Nissenbaum's trial counsel Ms. Truesdale, and Mr. Nissenbaum all testified and several exhibits regarding their communications were admitted.

¶ 18    Ms. Truesdale testified that she began representing Mr. Nissenbaum in February or March of 2015 and met with him about 15 times over the course of two years to discuss his case. These meetings ranged from one to three hours. Mr. Nissenbaum and Ms. Truesdale also exchanged numerous emails and telephone calls concerning his case. Mr. Nissenbaum emailed Ms. Truesdale about potential witnesses who could testify in his defense and other trial strategies throughout the pretrial stage of the proceedings.

¶ 19    In July 2015, ASA Innes discussed with Ms. Truesdale a possible plea deal on the attempted aggravated arson charge. Ms. Truesdale testified that discussions stalled, however, because Mr. Nissenbaum made clear he would only plead guilty to a misdemeanor and the proposed plea was to a felony. Mr. Nissenbaum described the situation differently. He testified that he simply wanted to discuss whether the State would be willing to negotiate a plea on a misdemeanor charge, but he also acknowledged that the State's invitation to discuss a plea was withdrawn prior to any agreement being reached.

¶ 20    On December 14, 2016, Mr. Nissenbaum came to Ms. Truesdale's office to review a copy of the charging document, which was admitted as evidence at the hearing. Ms. Truesdale included sticky notes next to each charge listing its class, sentencing range, and Mr. Nissenbaum's potential defenses. The sticky notes for the aggravated criminal sexual assault counts all included either the notation "consec," which Ms. Truesdale testified referred to consecutive sentencing, or a referral to a previous aggravated criminal sexual assault count that indicated "consec." Ms. Truesdale testified that the notation "consec" was written at a different time than some of the other notes and in a different color ink. She stated, however, that all of the marks on the sticky notes were present when she went through the charges with Mr. Nissenbaum on December 14, 2016. Mr. Nissenbaum testified that he saw the sticky notes but denied that Ms. Truesdale ever went through them with him.

¶ 21    Ms. Truesdale testified that she informed Mr. Nissenbaum "what [she] thought the chances of winning or losing [were] based on the presentation of the evidence," and further stated, "[a]t no point did I ever tell him that he was going to—that it was a slam dunk or that he, you know, would be acquitted of all his charges." She testified that she informed Mr. Nissenbaum of the possible realistic outcomes of his case "[m]any times" and made clear to him that it was possible he could

lose.

¶ 22    On March 23, 2017, Ms. Truesdale texted ASA Bagby, who had been assigned to replace ASA Innes: "[j]ust so I cover all grounds, was there ever an offer tendered on this?" ASA Bagby replied:

> "I think my previous position was that I could only make an offer on a sex count. I think things have changed and I could probably make an offer on an agg[ravated] domestic battery for probation and an order of protection. I think the current administration will have my back on this even though the victim will not be happy."

Ms. Truesdale responded she would discuss this proposal with Mr. Nissenbaum. The parties all agree in their briefing in this case that this was an offer to plead to a felony and, indeed, aggravated domestic battery is a Class 2 felony. 720 ILCS 5/12-3.3(b) (West 2016).

¶ 23    That same evening, Mr. Nissenbaum emailed Ms. Truesdale, telling her that he was interested in pursuing a plea deal if he would not face prison time or be required to register as a sex offender. Ms. Truesdale notified him of ASA Bagby's text and said they would discuss the matter at their next meeting the following week. Ms. Truesdale testified that she did not believe ASA Bagby's text was a "firm offer" but rather simply thought that they "had started negotiations."

¶ 24    This was ASA Bagby's understanding as well. She testified that the text message "wasn't an offer for [Mr. Nissenbaum] to accept"; rather, it "was an initiation of a conversation about making an offer." ASA Bagby was aware throughout the pretrial proceedings that Mr. Nissenbaum would not plead guilty to a sex offense. If he had "indicated that he would be interested in negotiating a disposition on the case to an aggravated domestic battery," however, she "would [have] dismiss[ed] the other counts." When asked if there was a time limit on this proposal or if it was open-ended, ASA Bagby testified, "[w]ell, again, this was an initiation on a conversation, so

7

I—I—I don't know what you mean by a proposal. This was simply my saying that if this was something that they were interested in, that this was something we could talk about." She later stated that "the entire text message [was] provisional, tentative, conditional" and that she had not intended her text to be a formal offer. ASA Bagby testified that in cases involving sexual assault or domestic violence, a plea negotiation is the result of multiple conversations. Additional terms the parties would need to discuss before an offer could be finalized included "mandatory jail time required under the aggravated domestic battery statute," probation conditions (including length and requirement of community service), the specifics of an order of protection, restitution, fees and fines, and counseling.

¶ 25    The following day, Mr. Nissenbaum emailed Ms. Truesdale about delaying the trial beyond April 11, 2017, when it was then set to begin. In an attachment to the email, Mr. Nissenbaum stated, "[i]f there is a chance that anything will give me a shot at moving forward in a world without a felony, [my parents] will support it and pay for it."

¶ 26    Ms. Truesdale testified that she discussed the State's text concerning the Class 2 felony proposal with Mr. Nissenbaum during their meeting on March 28, 2017. She stated he "was really in a trial frame of mind," and had consistently stated that he did not want a felony on his record because "[h]e wanted to work with kids." She stated, "I know that we discussed [ASA Bagby's text]. I think it was a very brief conversation, and he wanted to move forward with trial." Mr. Nissenbaum's recollection was that when they discussed the text, Ms. Truesdale did not discuss the amount of time he would face if he lost at trial, did not make a recommendation as to whether he should think about accepting an offer by the State, and did not tell him that the State could revoke an offer at any time. Mr. Nissenbaum further testified that he told Ms. Truesdale that he wanted to discuss the State's proposal with his family, and he would decide whether to accept it at

the April 11 court date. He denied telling her that he would not accept a plea resulting in a felony conviction.

¶ 27    On April 11, 2017, the parties appeared before the court. Ms. Truesdale testified that she asked Mr. Nissenbaum either just before or just after that court appearance whether he wanted her to pursue a plea offer, and he was still not interested. ASA Bagby testified that if Ms. Truesdale had expressed interest in discussing the terms and conditions of an offer on an aggravated domestic battery plea, she "would have negotiated a plea with Mr. Nissenbaum on that day."

¶ 28    Mr. Nissenbaum testified that he believed the State had made him an offer and that this offer would remain on the table until trial. According to him, he and Ms. Truesdale met outside the courtroom before the April 11 hearing but did not discuss the plea because they had "already discussed it" and Ms. Truesdale was, in Mr. Nissenbaum's words, "going to confer with the State that it was open till trial." He said that after the hearing, Ms. Truesdale told him that ASA Bagby said the offer would be open until trial. Mr. Nissenbaum reiterated that he would have accepted the plea had he known that he would face consecutive sentencing if convicted of aggravated criminal sexual assault and another Class X offense.

¶ 29    Following the court appearance, D.K. met with ASA Bagby, at which point ASA Bagby texted Ms. Truesdale that "[u]nfortunately, [she could not] plead this out to anything other than a sex offense." Although D.K. understood that Mr. Nissenbaum could be found not guilty at trial, she was adamant that the State not allow him to plead guilty to anything other than a sex offense. Ms. Truesdale then emailed Mr. Nissenbaum that D.K. "won't agree to the state's offer to a plea on the aggravated domestic battery so it is no longer on the table. The offer is now a plea on one of the sex offenses." Mr. Nissenbaum testified that he was surprised because he did not know that the State could revoke an offer once it had been presented.

¶ 30     On August 29, 2017, when trial was in recess, Mr. Nissenbaum emailed Ms. Truesdale that he did not want to spend 6 to 30 years in prison. Upon reading this email, Ms. Truesdale testified that she "had to confirm that he was looking at mandatory consecutive [sentencing]" but she did not have her file for the case or her computer with her, so she emailed ASA Bagby. ASA Bagby responded that the minimum sentence, if Mr. Nissenbaum were convicted of aggravated criminal sexual assault and aggravated kidnapping, would be 12 years in prison. Ms. Truesdale then emailed Mr. Nissenbaum this information.

¶ 31     Mr. Nissenbaum insisted that this was the first time Ms. Truesdale informed him that he faced consecutive sentencing. Ms. Truesdale, however, explained that she had been in close contact with Mr. Nissenbaum throughout pretrial preparations and that he had forgotten some of the things they had discussed. She denied ever telling Mr. Nissenbaum that he had a strong probability of acquittal or that if he were convicted it would be on a relatively minor charge for which he would be eligible for probation. Ms. Truesdale testified that she tried to give Mr. Nissenbaum realistic expectations about the outcome of taking his case to trial and the pros and cons of asserting D.K.'s consent to their sexual encounter as a defense.

¶ 32     The court denied Mr. Nissenbaum's posttrial motion at the hearing on March 28, 2019, after the conclusion of the evidence. The court first determined that the State had never extended a "firm" offer to Mr. Nissenbaum. The court reasoned that, while "the parties did discuss an offer" and began negotiations, "actual terms were never formalized." For example, there was no consensus on the length of probation, whether there would be an order of protection, or whether Mr. Nissenbaum would be required to go to counseling.

¶ 33     Although the court was concerned with Ms. Truesdale's "understanding of the applicable sentencing range and how she actually explained that to Mr. Nissenbaum," it nevertheless

determined that "Mr. Nissenbaum knew at a minimum that he was facing a Class X sentencing situation of 6 to 30 years." Noting that "[r]easonably informed does not mean perfectly informed," the court concluded that Mr. Nissenbaum had been reasonably informed of the potential outcomes of his trial and Ms. Truesdale had not performed deficiently. Similarly, the court determined that the evidence made clear that Mr. Nissenbaum and Ms. Truesdale met "on many occasions," and Ms. Truesdale "explained [his] case at length with him and prepared a defense." The court concluded that Ms. Truesdale "didn't guarantee an outcome in either direction" but rather "advise[d] Mr. Nissenbaum of the strengths and weaknesses not only of the State's case but of Mr. Nissenbaum's own theory of his defense." The court found that Ms. Truesdale therefore was not ineffective "in advising Mr. Nissenbaum about his trial prospects" or in "not forcing [him] to accept an offer" which the court again stressed was "never an actual offer."

¶ 34    The court additionally determined that, even if Ms. Truesdale had performed deficiently, this had not resulted in prejudice to Mr. Nissenbaum. The court stated it had "problems with Mr. Nissenbaum's testimony and the credibility of Mr. Nissenbaum's testimony on some points." The court, pointing to the fact that a potential plea was revoked in 2015 by ASA Innes, specifically cast doubt on Mr. Nissenbaum's claim that he did not understand that the State could revoke an offer for a plea once it had been made. In the court's view, it was "clear that Mr. Nissenbaum did not want an offer" but rather that he "wanted a trial." The court concluded that Mr. Nissenbaum failed to establish a reasonable probability that he would have accepted an offer from the State. Finally, the court stated:

> "the State's case rested in large part on the complaining witness'[s] credibility. And while there were large amounts of uncontested facts, credibility remained a very triable issue. This was not the slam dunk of a case for the State that the posttrial counsel, I think, tries to

paint.

\* \* \*

"This was not a case where trial counsel could not win, as posttrial counsel suggests. This was simply a case that [Mr. Nissenbaum] did not win, and that is the difference here."

¶ 35    Mr. Nissenbaum was sentenced to 14 years in prison, with an 8-year sentence for aggravated criminal sexual assault running consecutively to a 6-year sentence for home invasion. All other sentences ran concurrently.

¶ 36    This appeal followed.

¶ 37                                II. JURISDICTION

¶ 38    A final judgment of conviction was entered on May 6, 2019, and Mr. Nissenbaum timely filed his notice of appeal on May 16, 2019. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 39                                III. ANALYSIS

¶ 40    On appeal, Mr. Nissenbaum argues that his conviction should be reversed because his trial counsel was ineffective during the plea negotiation process. We disagree.

¶ 41    Defendants have the right to effective assistance of counsel during their criminal proceedings. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; see also *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (the right to counsel means the right to effective assistance of counsel). This right extends to all critical stages of the criminal proceedings (*Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)), including the plea negotiation process (*Missouri v. Frye*, 566 U.S. 134, 141 (2012)).

¶ 42    Counsel is ineffective when he or she performs deficiently and that deficient performance results in prejudice to the defendant. *Strickland*, 466 U.S. at 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard in Illinois); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985) (*Strickland* governs claims of ineffective assistance during plea negotiations). Counsel performs deficiently where his or her representation falls "below an objective standard of reasonableness" (*Strickland*, 466 U.S. at 688), and a defendant is prejudiced when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694). Because a finding of ineffective assistance of counsel requires that both prongs of this test be established, courts may analyze prejudice first if it is easier to dispose of the claim under that prong. *Id.* at 697. We find that Mr. Nissenbaum cannot demonstrate prejudice and limit our analysis accordingly.

¶ 43    To establish prejudice where a defendant alleges that his counsel's deficient performance resulted in the rejection of a plea offer, the defendant must demonstrate a reasonable probability that absent his attorney's deficient performance, (1) he would have accepted the plea offer, (2) the State would not have withdrawn the offer, and (3) the trial court would have accepted the agreement. *Frye*, 566 U.S. at 147; *People v. Hale*, 2013 IL 113140, ¶ 20 (adopting *Frye* factors in cases where defendants allege counsel's deficient performance led the defendant to reject a plea deal in Illinois). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This requires more than a subjective, self-serving statement from the defendant. *Hale*, 2013 IL 113140, ¶ 18. "Rather, there must be 'independent, objective confirmation that [the] defendant's rejection of the proffered plea was based upon counsel's erroneous advice,' and not on other considerations." *Id.* (quoting *People v. Curry*, 178 Ill. 2d 509, 532 (1997)).

13

¶ 44    We review claims of constitutional violations *de novo*. *Hale*, 2013 IL 113140, ¶ 15. However, any factual determination made by the trial court based on an evidentiary hearing are reviewed under the manifest weight of the evidence standard. *People v. Stanley*, 397 Ill. App. 3d 598, 612 (2009); see also *Hale*, 2013 IL 113140 ¶ 24 (reviewing the trial court's determination that the defendant's posttrial testimony was not credible under the manifest weight of the evidence standard). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 45    The first serious problem with Mr. Nissenbaum's claim that he suffered prejudice is that there was no specific offer in this case and certainly no basis for a finding that this "offer" would not have been withdrawn by the State. "Plea negotiations are generally governed by the principles of contract law" (*People v. Robinson*, 2012 IL App (4th) 101048, ¶ 36), and an offer, under contract law, requires certain *definite* terms (*Calo, Inc. v. AMF Pinspotters, Inc.*, 31 Ill. App. 2d 2, 8 (1961)). ASA Bagby texted that she could "probably make an offer on an agg[ravated] domestic battery for probation and an order of protection" and that she "think[s] the current administration will have [her] back on this." She used tentative language and provided no formalized terms.

¶ 46    While Mr. Nissenbaum is correct that his claim does not necessarily require a formal offer, the lack of any specific offer creates additional layers of conjecture as to what the offer would have been and whether he would have accepted it. The fact that there was a vague proposal, rather than a firm and specific offer from the State, runs contrary to any claim that Mr. Nissenbaum demonstrated that he would have accepted this "offer" but for the faulty advice of his attorney.

¶ 47    Moreover, it is apparent that, after meeting with D.K. after the hearing on April 11, 2017, the State made clear that the suggestion they "probably" could make an offer for domestic battery

for probation was no longer true. During their meeting, D.K. objected to the State's tentative "offer" and was "adamant" that the State only extend an offer on "a sex offense." So, to the extent that the parties could have ultimately negotiated an offer, it would have been withdrawn on April 11, 2017. Thus, Mr. Nissenbaum's claim fails for his inability to show that there was an offer by the State that would not have been withdrawn.

¶ 48    In addition, the trial court made a specific factual finding that Mr. Nissenbaum failed to show that he would have accepted this "offer" but for his attorney's ineffective assistance. This finding is not contrary to the manifest weight of the evidence and indeed is fully supported by the record.

¶ 49    Mr. Nissenbaum claims that Ms. Truesdale was ineffective because she failed to (1) inform him of mandatory consecutive sentencing under section 5-8-4 of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(2) (West 2014)), (2) adequately appraise him of the realistic outcomes of the trial, (3) provide an informed recommendation of whether to plea, and (4) inform him that the State could withdraw a plea offer at any time until it is accepted by the court.

¶ 50    The trial court made specific findings of fact that some of this simply did not occur. The court found that Ms. Truesdale met with Mr. Nissenbaum multiple times, thoroughly discussed his case with him, and "didn't guarantee an outcome in either direction" but rather "advise[d] Mr. Nissenbaum of the strengths and weaknesses not only of the State's case but of Mr. Nissenbaum's own theory of his defense." The trial court also made a determination that Mr. Nissenbaum's testimony was not credible regarding his statement that he did not know the State could revoke a plea offer. The court's findings are supported by the record. Numerous emails and Mr. Nissenbaum's own testimony demonstrate that the parties met many times and had detailed discussions concerning the case. Mr. Nissenbaum had first-hand experience of the State revoking

an offer to plea, which it did in 2015 with its offer that he plead to attempted aggravated arson.

¶ 51    However, the trial court appeared to agree that Ms. Truesdale may have failed to explain the fact that, if convicted, Mr. Nissenbaum faced mandatory consecutive sentencing. Mr. Nissenbaum argues that he would have accepted a plea offer from the State but for his attorney's alleged failure to inform him of this and to give him a realistic appraisal of his prevailing in a trial. On this point, Mr. Nissenbaum makes two different arguments. First, he argues, based on federal case law, that he need not provide objective evidence to support his own testimony that he would have accepted this offer. Second, he claims that, to the extent objective evidence is required, he has provided it. We reject both of these arguments.

¶ 52    In support of his first argument, Mr. Nissenbaum relies on a Seventh Circuit opinion stating that the federal rule, outlined in *Toro v. Fairman*, 940 F. 2d 1065, 1068 (1991), that a petitioner must supply objective evidence that he would have accepted the plea had "shaky foundations." *Foster v. United States*, 735 F. 3d 561, 567 (7th Cir. 2013). Mr. Nissenbaum likewise calls our attention to Judge Rovner's concurrence in *Paters v. United States*, where—rejecting the majority's opinion on the matter—she stated that "*Strickland* does not impose an objective evidence requirement." 159 F. 3d 1043, 1049 (7th Cir. 1998) (Rovner J., concurring). However, our own supreme court has specifically held that self-serving testimony alone is insufficient to establish prejudice under *Strickland* on claims of ineffective assistance of counsel during the plea negotiation process. *People v. Curry*, 178 Ill. 2d 509, 531 (1997); *Hale*, 2013 IL 113140, ¶ 18. *Foster*'s criticism of the federal rule provides no basis for us to depart from this holding. See *People v. Spahr*, 56 Ill. App. 3d 434, 438 (1978) (finding that "Illinois supreme court decisions are binding on all Illinois courts" while decisions of Federal district courts are not).

¶ 53    In support of his second argument, Mr. Nissenbaum points to four pieces of objective

evidence to corroborate his claim: (1) the disparity in length between the State's proposed offer of probation and the mandatory minimum sentence of 12 years in prison he faced if convicted of aggravated criminal sexual assault and another Class X offense, (2) the disparity between the several Class X offenses Mr. Nissenbaum was convicted of and the possibility of pleading guilty to a single Class 2 offense, (3) his "verifiable, active pursuit of a plea deal," and (4) the "undisputed, incriminating facts and the strong probability of conviction following trial." However, none of this evidence is sufficient to demonstrate that the trial court's finding—that Mr. Nissenbaum would not have accepted the State's plea "offer"—was against the manifest weight of the evidence.

¶ 54    As Mr. Nissenbaum points out, our supreme court in *Hale* recognized that "[t]he disparity between the sentence a defendant faced and a significantly shorter plea offer can be considered supportive of a defendant's claim of prejudice." *Hale*, 2013 IL 113140, ¶ 18. However, such disparity alone does not automatically demonstrate that a defendant would have accepted the offer. There still must be evidence that counsel's deficient performance "*led defendant to reject the plea offer*." (Emphasis in original.) *Id.* ¶ 23. And indeed, despite a disparity in *Hale* of 25 years between what the defendant was offered and what the defendant received, the court still found that the defendant failed to demonstrate it was reasonably probable that he would have accepted the plea. *Id.* at ¶ 27.

¶ 55    Mr. Nissenbaum's claim here is that he did not know that he faced a *minimum* sentence of 12 years. We agree that there is a great disparity between 12 years in prison and the offer of an indeterminate length of probation. However, there is also a great disparity between 6 years in prison, which Mr. Nissenbaum does not dispute that he was aware he faced, and an offer of probation. We do not think the trial court's finding was contrary to the manifest weight of the

17

evidence because the court did not accept this disparity as proof that Mr. Nissenbaum would have accepted the State's "offer." This case is quite dissimilar to *Curry*, a case on which Mr. Nissenbaum relies. The defendant in that case thought he was facing a sentence of only 4 years in prison when he chose to reject a plea deal in exchange for 4.5 years in prison. *Curry*, 178 Ill. 2d at 531. Obviously, the causal connection between counsel's performance and the rejection of the plea in that case was far more profound.

¶ 56    Mr. Nissenbaum's argument regarding the contrast between the number and gravity of the counts likewise fails. This was information Mr. Nissenbaum was aware of and apparently unaffected by. It therefore provides no evidence of a causal connection between his attorney's performance and his decision not to accept the State's "offer."

¶ 57    Mr. Nissenbaum next argues his "verifiable, active pursuit of a plea deal" is evidence that he would have accepted a plea offer. However, Mr. Nissenbaum failed to accept the first plea offer—made back in 2015 to an attempted aggravated arson charge—prior to that offer being revoked. And while he expressed renewed interest in a plea deal on March 23, 2017, this interest had strings attached. He stated he would not accept an offer that included time in jail or an offer where he had to register as a sex offender. Further, Ms. Truesdale testified that Mr. Nissenbaum made it clear he did not want a felony on his record and Mr. Nissenbaum's email corroborated this. That email, which was written after ASA Bagby's text "offer" stated: "[i]f there is a chance that anything will give me a shot at moving forward in a world without a felony, [my parents] will support it and pay for it." Mr. Nissenbaum's ongoing willingness to discuss a plea deal does not demonstrate that he would have accepted an offer to plead guilty to the felony charge which was being proposed as a possibility by the State at that time.

¶ 58    Finally, Mr. Nissenbaum argues that the "undisputed, incriminating facts and the strong

probability of conviction following trial" is evidence that he would have accepted a plea offer. However, the trial court, who presided over the evidentiary hearing and the trial rejected this view of the trial evidence. As the trial court stated, "[t]his is not a case where trial counsel could not win, as posttrial counsel suggests. This is simply a case that [Mr. Nissenbaum] did not win."

¶ 59     Mr. Nissenbaum has failed to demonstrate a reasonable probability that, but for counsel's deficient performance, he could or would have accepted a plea offer from the State. He has fallen far short of demonstrating that the trial court's finding that this probability did not exist was contrary to the manifest weight of the evidence.

¶ 60     In short, Mr. Nissenbaum's ineffective assistance of counsel claim clearly fails under the second *Strickland* prong. He cannot demonstrate prejudice. We will assume that the trial judge would have accepted a plea agreement if one had been reached. However, the evidence is clear that no offer was ever really extended, rather a very tentative plea deal was proposed and was withdrawn, based on D.K.'s objection to it. In addition, the trial court's finding that Mr. Nissenbaum would not have accepted what was proposed, even if it had been a firm offer, was supported by, and not contrary to, the manifest weight of the evidence.

¶ 61                              IV. CONCLUSION

¶ 62     For the foregoing reasons, we affirm the decision of the trial court.

¶ 63     Affirmed.